IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| KANDY LINTHICUM, | : | Case No. 1:02-cv-480 |
| | : | |
| Plaintiff, | : | District Judge Susan J. Dlott |
| | : | |
| v. | : | |
| | : | |
| P.O. ROBERT JOHNSON *et al.*, | : | OPINION ON DENIAL OF |
| | : | DEFENDANT CITY OF |
| Defendants. | : | CINCINNATI'S MOTION FOR |
| | : | SUMMARY JUDGMENT |

This matter comes before the Court on Defendant City of Cincinnati's Motion for

Summary Judgment (doc. #46).  On May 23rd, 2006, the Court entered an order denying the

City's Motion.  (Doc. #58.)  This opinion sets forth the grounds for that denial and limits the

theories that Linthicum may argue at trial.

## I.    BACKGROUND

Plaintiff Kandy Linthicum ("Linthicum") has sued the City of Cincinnati ("City") and

Cincinnati Police Officers Robert Johnson ("Johnson") and Robert Kidd ("Kidd"), alleging that

Johnson and Kidd sexually assaulted her in violation of the federal constitution and Ohio tort

laws.  She avers that the City is liable for her constitutional injuries under 42 U.S.C. § 1983,

because Johnson and Kidd relied on their status as police officers to carry out her assault and

acted against a backdrop of inadequate investigation and discipline[1] of police who engage in

---

[1] Linthicum's memorandum on the present motion also raises the issue of inadequate
police training, but the Court has determined that this issue falls outside the scope of her
complaint and therefore does not consider it.  See infra Part III.C.3.a.

1

similar civil rights violations. (Doc. #1.)

### A. Factual Background[2]

#### 1. Alleged Sexual Assault (November 29th or 30th, 2001)

##### a. Meeting at Madonna's and Travel to Linthicum's Apartment

On the night of November 29th, 2001, Linthicum attended a meeting and then celebrated her upcoming fortieth birthday at two bars in downtown Cincinnati, the Phoenix and Madonna's. (Deposition of Kandy Linthicum, March 10th, 2005 (hereinafter "Linthicum 3/05 Dep.") at 5-6.) Linthicum drank three to six beers at the Phoenix between 7 and 9 p.m. and then moved to Madonna's, where she knew a number of the other patrons. (Id. at 61; Deposition of Kandy Linthicum, November 20, 2002 (hereinafter "Linthicum 11/02 Dep.") at 93, 109-110.) She drank an additional six to eight beers and four or five "birthday shots" of liquor at Madonna's, for an approximate total of nine to twelve beers and four to five shots.[3] (Linthicum 3/05 Dep. at 6-7; see also Linthicum 11/02 Dep. at 110-111.) Linthicum recalls that she had rarely, if ever,

---

[2] The following account includes a number of facts that may ultimately prove inadmissible under Federal Evidence Rule 412, otherwise known as the "rape shield" rule, and/or related rules excluding character or highly prejudicial, minimally probative evidence. Summary judgment motions must ordinarily be predicated on evidence admissible at trial. See infra Part II. The Court has nonetheless determined that in this particular case, it may consider all evidence as to which there is at least a fair question as to admissibility – thus deferring certain admissibility questions for later hearing. As discussed at Part III.A, infra, the Court concludes that even a jury with access to this additional evidence could find that there is a genuine dispute of material fact as to whether Linthicum consented to sex with Officers Kidd and Johnson. Because this additional evidence appears – on balance – far more prejudicial to Linthicum than to the City on the consent issue, it follows that a reasonable jury without access to the additional evidence could also find for Linthicum, and that the City is not entitled to summary judgment on the consent issue regardless of whether the evidence is treated as admissible.

[3] At one point in her deposition, Linthicum estimated she consumed all of these drinks within three hours. (Id. at 7.) However, she did not indicate what time she arrived at the Phoenix and did not know precisely when she left Madonna's.

2

consumed as much beer on a night out.  (Linthicum 11/02 Dep. at 110-111.)

Officers Kidd and Johnson went on shift at 11:00 p.m. the night of November 29th, 2001. Both officers were in full police uniform, with visible badges and holstered, partially visible guns under their uniform jackets.  (Deposition of Robert Kidd, January 21, 2005 (hereinafter "Kidd 1/05 Dep.") at 18-19; Deposition of Robert Johnson, January 21, 2005 (hereinafter "Johnson 1/05 Dep.") at 19-20.)  Madonna's was in the Officers' district, but not on their beat. ((Deposition of Robert Kidd, November 21, 2002 (hereinafter "Kidd 11/02 Dep.") at 96.)  Kidd has testified that he and Johnson had visited the bar for lunch on 29th and were asked by an on-duty manager to return that night and check on "something [that was] going on." (Id.)

Kidd estimates that he and Johnson arrived at Madonna's sometime between 12:30 and 12:45 a.m. on November 30th and stayed ten or fifteen minutes at most.  (Kidd 11/02 Dep. at 95-97.)  He recalls that he and Johnson walked down the length of the bar towards the back of the room, where they spoke with the bartender and one of the managers.  (Id. at 97-99.)  He recalls that Linthicum briefly approached him there, touched his chest through his uniform, rubbed his head, and said something to the effect that he was "cute."  (Id. at 98-100.)  He initially testified that he took her for a "police groupie" of sorts.  (Id. at 99.)  However, Kidd has since testified that he believes it was his African-American race[4] rather than his position as a police officer that attracted Linthicum, recalling her later comments to the effect that she was "pretty much interested in only black guys."  (Kidd 1/05 Dep. at 55-56.)

According to Kidd, as he and Johnson were leaving Madonna's, they were stopped near the door by Linthicum and a male patron.  (Kidd 11/02 Dep. at 97-98, 100-101.)  Kidd

---

[4] Both Kidd and Johnson are African-American.

3

remembers the patron asking whether they could give Linthicum a ride home because she had had too much to drink, and himself and Johnson responding that they could.  (Id. at 98, 101-102.) He recalls Linthicum describing roughly where her apartment was located, and possibly also denying that she was intoxicated.  (Id. at 98, 102.)  Kidd remembers that Linthicum appeared "possibly" intoxicated, but not too intoxicated or drunk that she lacked coordination or control, was otherwise "impaired," or could not have made it home on her own.  (Id. at 102-104; see also Kidd 1/05 Dep. at 27-28, 32-33.)  He also remembers Linthicum telling him how much she had had to drink, although he can no longer recall what exactly she said.  (Kidd 1/05 Dep. at 32-33.) By contrast, Johnson has testified that he had no idea how much Linthicum had had to drink. (Johnson 1/05 Dep. at 40-42.)  In any event, Kidd and Johnson both recall Linthicum was "talking clearly" and doing nothing that would lead them to believe she was too drunk to see herself home or care for herself.  (Id. at 27-28, 33; Johnson 1/05 Dep. at 35-36.)  Kidd has testified that it is not out of the ordinary for police officers to give courtesy rides[5] in such cases, and recalls giving rides to other women "more than twice" before November 29th.  (Kidd 11/02 Dep. at 104.)  However, Kidd has testified that Linthicum's apartment was outside his and Johnson's district, and at least suggested that it was a violation of police rules to even travel there.  (See id. at 62-64.)

Linthicum has testified that sometime after midnight – she estimates it was 12:30 or 1:00 a.m. on November 30th – she either asked or prepared to ask a Madonna's bartender call her a

---

[5] Johnson has also testified that he understands courtesy rides to be within the scope of his police work or duties.  (Johnson 1/05 Dep. at 21-23.)

4

cab home. (Linthicum 3/05 Dep.; Linthicum 11/02 Dep. at 112-113.)[6] She recalls that either one

or both of the Officers then approached her and asked why she was leaving and how she was

getting home.[7] (Linthicum 3/05 Dep. at 11-12; Linthicum 11/02 Dep. at 113-114.) She

responded that she was leaving because she had had too much to drink, and added – "thinking

that they're interrogating me, thinking that I'm driving, thinking they're being aware of my

safety" – that she was taking a taxi, or possibly a bus.[8] (Linthicum 3/05 Dep. at 12, 14, 36; see

also Linthicum 11/02 Dep. at 112-116.) According to Linthicum, the Officers responded that

they could give her a ride home instead. (Linthicum 3/05 Dep. at 12; see also Linthicum 11/02

Dep. at 116.) Linthicum reports that she was initially "shocked" by this suggestion, but agreed

once the Officers explained that "we do that sometimes" and she realized that accepting the ride

would spare her the cab fare. (Linthicum 3/05 Dep. at 12-14, 18; Linthicum 11/02 Dep. at 116-

117.) They also indicated that it would not be a problem for Linthicum to bring along the six-

pack of "carry-out" beer she had either just bought, or was about to buy, from the Madonna's

bartenders. (Linthicum 3/05 Dep. at 16; Linthicum 11/02 Dep. at 116-118.)

     Linthicum has testified that several other people at Madonna's, including the bartender

---

[6] Linthicum has testified that she checked the time in the course of leaving Madonna's, and realized she had missed the last bus, a 12:35 bus to Clifton. (Linthicum 11/02 Dep. at 115.)

[7] Linthicum cannot recall whether she was approached by Officer Kidd, Officer Johnson, or both. (Id. at 14.) She has testified that she "wasn't able to even pick them out till months later." (Id.)

[8] The precise sequence of these events is not entirely clear. Linthicum has testified that she eventually realized she had missed the last bus, but it is unclear whether this happened before or after she decided to call a cab, or before or after the Officers approached her. (See, e.g., Linthicum 11/02 Dep. at 112-116.) She has also testified that she may have tried to walk outside to a cab stand before realizing she had missed the last bus, and before asking the bartender to call her a cab. (Id. at 115-116.) Linthicum attributes her uncertainty as to at least some details of her Madonna's departure to her intoxication. (Id. at 118-119.)

who called her the cab, knew that she had accepted a ride from the Officers.  (Linthicum 3/05 Dep. at 16-19; Linthicum 11/02 Dep. at 117.)  She has testified that as she left the bar, fellow patrons expressed amazement that the police officers were taking her home, because that was "something they'd never seen before."  (Linthicum 3/05 Dep. at 19.)  Linthicum recalls that some patrons asked her if she was sure she was "okay," and suggested she should be careful. (Id. at 16-19, 23.)  She also recalls, however, that the Officers appeared very "congenial" and interested in helping her, that they had not threatened her in any way, and that she was operating on the assumption that they sometimes assisted citizens who could not get home safely.  (Id. at 18.)

Linthicum has testified that the Officers never suggested they might arrest her for public intoxication or any other reason, and that she understood she was not legally bound to accept a ride from them.  (Id. at 52.)  She is also sure there was no physical contact between herself and the Officers at the bar.  (Linthicum 11/02 Dep. at 119.)  However, she also avers that she left Madonna's with the Officers only "because they were police officers in their uniforms on duty, providing [sic] my safety."  (Linthicum 3/05 Dep. at 42; see also Linthicum 11/02 Dep. at 199.) Linthicum insists she "never would have left with two complete strangers" had they not been police.  (Linthicum 3/05 Dep. at 42; see also Linthicum 11/02 Dep. at 199)  She has further testified that she would not have left even with police officers had she not been intoxicated and her judgment "impaired."  (Linthicum 11/02 Dep. at 199-200.)  She suggests that she may not have so readily concluded that Officers Kidd and Johnson were "being helpful," noting that no police officer had ever offered her a ride home before.  (Id.)

Linthicum, Kidd and Johnson walked to the Officers' police cruiser, which was parked at

the curb just outside the entrance to Madonna's.  (Linthicum 3/05 Dep. at 14-15.)  Linthicum has testified that she did not need the Officers' help walking to the cruiser or getting seated, although one of the Officers may have opened the back door for her.  (Id. at 15-16; see also Linthicum 11/02 Dep. at 118.)  Linthicum was also able to tell them where she lived, although she does not recall whether she gave directions.  (Id. at 25.)  She has testified that while in the cruiser, she and the Officers all drank from her carry-out six pack.  (Id. at 28; see also Linthicum 11/02 Dep. at 120.)  Linthicum says she recognizes the Officers should not have been drinking on duty, but that their behavior helped put her at ease at the time because she figured she would not be allowed to drink in the cruiser if she were actually "in trouble" with the law.  (Linthicum 3/05 Dep. at 30-32.)  She does not recall much conversation in the cruiser, but she thinks she and the Officers may have discussed University of Cincinnati ("U.C.") basketball.  (Linthicum 11/20 Dep. at 120-21.)  She does not remember any other discussions, but has speculated that she may simply not recall them because she was "impaired."  (Id.)

At some point – either en route to the apartment, outside the apartment in the cruiser, or at the door of her apartment – Linthicum realized she had left her jacket and keys at Madonna's, and the Officers drove her back to the bar to retrieve them.  (Linthicum 3/05 Dep. at 20, 26-27; Linthicum 11/02 Dep. at 120, 125; Kidd 11/02 Dep. at 92-93, 107-108; Kidd 1/05 Dep. At 34.)  As the Officers waited in the cruiser, Linthicum walked into Madonna's to pick up her jacket, keys, and possibly a second six-pack of beer.  (Linthicum 3/05 Dep. at 27, 29, 32, 53; Linthicum 11/02 Dep. at 125-28.)  She has testified that other patrons appeared "shocked" that the Officers had brought her back to the bar – so much so that at least one patron came outside the bar to watch Linthicum get into the cruiser for the second time.  (Linthicum 3/05 Dep. at 20-21;

7

Linthicum 11/02 Dep. at 126-27.)  She recalls sensing that at least some of these patrons felt the situation was not "normal"[9] and demanded more caution on her part.  (Linthicum 3/05 Dep. at 21-23.)  Nevertheless, she says she felt she was in no danger, suggesting that her own perception may have been impaired "because I was intoxicated."  (Id. at 22-23, 30-33.)

Kidd has testified that he did not observe Linthicum buy any carryout beer at Madonna's, bring any beer into the cruiser, or drink beer at any time, but suggests that beer "could have been concealed in something she carried."  (Kidd 11/02 Dep. at 106-107.)  Both Officers remember that Linthicum was able to walk on her own, without assistance from either Officer.[10]  (Kidd 1/05 Dep. at 29; Johnson Dep. at 36.)  Kidd has testified that Linthicum was "functioning fine" in the cruiser and that he did not regard her as "drunk" or "heavily intoxicated," although he admits he may have used the latter phrase in describing Linthicum to Internal Affairs.  (Id. at 126-27.)  He recalls that Linthicum was able to provide Johnson complete, turn-by-turn directions to her apartment.  Johnson says that Linthicum provided her address and later pointed out her apartment, but that he was familiar enough with the route not to need directions. (Johnson 1/05 Dep. at 36-38.)

Kidd has also testified that Linthicum was able to carry on a very "clear-headed" conversation with the Officers while they were together in the cruiser.  (Kidd 1/05 Dep. at 28-

---

[9] Linthicum has also testified that she probably told other patrons that she and the Officers had been drinking together during her return visit to Madonna's.  (Linthicum 3/05 Dep. at 32.)  Linthicum does not recall being specifically warned that the Officers may have wanted to have sex with her, and flatly denies telling anyone at Madonna's that she wanted to have sex with "two black cops" or men.  (Id. at 22-23.)

[10] Kidd and Johnson both recall that Kidd may have helped Linthicum into or out of the cruiser, but Kidd has testified that many individuals need help because of the "tight squeeze," and Johnson has suggested that back seat passengers must always be let out.  (Kidd 1/05 Dep. at 29; Johnson 1/05 Dep. at 38.)

30.) Specifically, Kidd remembers that he and Linthicum began discussing U.C. basketball after Linthicum mentioned that Kidd resembled a friend of hers who had played on the team, and Kidd responded that he knew and had played with Nelson. (Kidd 11/02 Dep. at 108-109, 112.) He recalls Linthicum inviting him and Johnson to call her if they ever needed U.C. tickets, and writing her phone number down on a pad or paper Kidd was carrying with him that night. (Id. at 109.) He recalls that Linthicum seemed comfortable, particularly after she found out that Kidd knew Nelson. (Id. at 112, 126.) He also remembers Linthicum commenting that it was "pretty cool" of him and Johnson to give her a ride home, saying they weren't like other officers she knew. (Id. at 112.) He recalls Linthicum attempting to show the Officers a piece of lingerie that she said she had modeled or bought at Madonna's. (Id. at 125-26; Kidd 1/05 Dep. at 33-34.) Finally, he recalls Linthicum commenting on how "cute and nice looking" she thought Kidd was their "entire time" in the cruiser. (Kidd 11/02 Dep. at 108.)

### b. Sexual Encounter (Alleged Assault) at Linthicum's Apartment

After their return trip to Madonna's, the Officers drove[11] Linthicum back to her apartment and parked on the street, arriving – by Linthicum's guess – around 2:00 a.m. (Id. at 33, 37; Linthicum 11/02 Dep. at 129.) Linthicum cannot recall any conversation during this second trip, perhaps because – by her testimony – her intoxication was deepening. (Linthicum 11/02 Dep. at 128-29.) She remembers one of the Officers telling her they would see her in and make sure she got inside. (Id. at 129-30.) She does not recall who led the way or who used her

_____

[11] Linthicum initially testified that she drank more beer on the return trip to her apartment, but has since testified that she does not recall whether anyone drank on the return trip. (Cf. Linthicum 11/02 Dep. at 127-28 and Linthicum 3/05 Dep. at 29.) Linthicum also does not recall whether anyone drank from the putative second six-pack, or what happened to it, after she and the Officers arrived at her apartment. (Linthicum 3/05 Dep. at 53.)

keys to open the security door at the entrance, although she has once testified that she remembers "being assisted" on the walk.  (Linthicum 3/05 Dep. at 33-34; Linthicum 11/02 Dep. at 129.) She acknowledges that she must have led the Officers to her apartment, two stories up, but contends that because she had lived in the building for three and a half years at the time, finding her way would have been virtually "automatic" even in a relatively incapacitated state. (Linthicum 3/05 Dep. at 34-35.)  Linthicum has testified that she was in a sort of alcohol-induced "blackout" by this point, and – as a result of her intoxication and the passage of time – remembers only "bits and pieces" of the rest of the night.  (Id. at 38-39.)

Linthicum does not remember who used her keys to unlock her apartment door, or whether she invited the Officers inside.  (Id. at 37-38.)  She does not recall that the Officers forced their entry or physically threatened her into letting them in, or otherwise indicated that it was "their official responsibility" to enter her apartment.   (Id. at 38-39.)  She remembers feeling the Officers were "still being helpful" and that her "best interest was still in their hands," and reasons she may have inferred at the time that the Officers were acting within their official capacity because of their earlier representations that "this is what they do, they do this sometimes, they take people home, they ensure that people get home safely."  (Linthicum 3/05 Dep. at 39-40.)  Linthicum says she doubts she was "even capacitated enough" at the time to form a definite opinion as to the Officers' interests, and says she now realizes that the Officers must have had other, more "personal motives" for entering her apartment.  (Id. at 41-43.)  She reasons, however, that either she could easily have understood the Officers' actions as somewhat official at the time, because she still "thought they [were] still providing my safety" pursuant to their earlier representations about taking people home.  (Id. at 42-43.)

10

Kidd has testified that when the cruiser pulled into her apartment complex, Linthicum asked the Officers if they were busy and invited them to "come up for a while." (Kidd 11/02 Dep. at 112-113; see also Johnson 1/05 Dep. at 23.) Kidd recalls that at this point, he began to suspect Linthicum had motives "other than just getting a ride home" and "something was going to occur due to the innuendos and statements [Linthicum] had made." (Id. at 70, 113; Kidd 1/05 Dep. at 13.) He also recalls debating whether to accept the invitation as he let Linthicum out of the cruiser and deciding to accept after hearing Johnson say they could go up for a minute or two. (Kidd 11/02 Dep. at 113.) Nonetheless, he has testified that sex was not discussed on the walk to Linthicum's door, and that it was not until after the Officers had entered Linthicum's apartment that he realized sex was a possibility. (Id. at 67-68, 113-114.) Johnson has testified that the Officers accompanied Linthicum inside her apartment to "make sure she was fine."[12] (Johnson 1/05 Dep. at 23-24.)

Johnson remembers that Linthicum walked up to her apartment building ahead of him, apparently unassisted, and used her key to open her apartment door. (Id. at 38, 42.) Kidd remembers Linthicum leading both Officers into her apartment, throwing down her jacket or purse, and leaving the room for a moment. (Id. at 60-61, 64, 69, 112-113.) Kidd remembers feeling nervous about being off his beat and out of his district, wondering whether Linthicum "was going to continue to come on to [him]," and thinking it would be wrong to engage in sex with Linthicum. (Id. at 62-63, 72-73.) He has testified that it was not until Linthicum emerged from the other room having changed into lingerie – apparently without prompting from the

---

[12] Johnson has further testified that he did not consider entering Linthicum's apartment to be a police duty, but also that it was not until the Officers were inside that they "overstepped" their official boundaries and began acting in accordance with their own private interests. (Id.)

Officers – he "pretty much knew" they would be having sex.  (Id. at 66, 68, 73; Kidd 1/05 Dep. at 23, 34; see also Johnson 1/05 Dep. at 23.)

Both Kidd and Johnson have testified that Linthicum "enticed" them into sex.  (Kidd 1/05 Dep. at 23; Johnson 1/05 Dep. at 31.)  The Officers have described Linthicum walking over to sit on her bed, grabbing Kidd by the waistband and pulling him over to her.  (Kidd 11/02 Dep. at 73-74; see also Johnson Dep. at 31.)  Kidd has testified that Linthicum then began rubbing his genitals and acting as the sexual "aggressor," and that he ultimately decided to "give in to temptation" and let her perform oral sex on him.  (Kidd 11/02 Dep. at 73-75.)  He remembers Linthicum attempting to remove his gun belt, apparently after he had removed his pants, and that he helped Linthicum remove the belt, laid it on the floor next to the bed, and pushed it away with his foot.  (Id. at 77.)  He recalls that in the course of oral sex with him, Linthicum paused to comment that she had "never been with two black guys at once" and  ask whether his partner – Johnson – was afraid of her.  (Id. at 76-79.)  Johnson remembers removing his own gun belt six to eight feet from Linthicum.  (Johnson 1/05 Dep. at 25.)  Johnson recalls Linthicum taking off at least part of her own lingerie; Kidd is less certain as to whether or how the lingerie was removed. (Johnson 1/05 Dep. at 33, 38-39; Kidd 1/05 Dep. at 35.)

Kidd remembers Johnson approaching the bed, Linthicum rubbing Johnson's genitals, and Johnson fondling and using a sex toy[13] on Linthicum as Linthicum and Kidd had oral sex. (Id. at 76-78, 80-83; see also Johnson 1/05 Dep. at 32-33.)  He recalls condoms being retrieved, he believes by Linthicum, Johnson removing his pants, and Linthicum beginning to perform oral sex on Johnson.  (Id. at 79-84.)  Kidd then recalls having vaginal intercourse with Linthicum as

---

[13] Kidd says he is not sure where the toy came from, but speculates that it must have been Linthicum's.  (Id. at 81-83.)

she continued to perform oral sex on Johnson.  (Id.)  Next, Kidd remembers using the restroom, dressing, and putting on his gun belt as Linthicum and Johnson had vaginal intercourse.  (Id. at 80, 84-87.)  Finally, he recalls standing by Linthicum's bed as Johnson used the restroom, hearing Linthicum "express some kind of enjoyment"[14] and interest in seeing the Officers again. (Id. at 87-88; see also Kidd 1/05 Dep. at 24-25 and Johnson 1/05 Dep. at 32.)   Both Officers have testified that Linthicum may have put on another piece of clothing, variously described as a robe, large T-shirt, or sweats, after intercourse and before they left.  (Kidd 1/05 Dep. at 35-36; Johnson 1/05 Dep. at 39-40.)

Kidd and Johnson left Linthicum's apartment without making any definite plans to see Linthicum again.  (Kidd 11/02 Dep. at 87-88.)  Johnson remembers directing Linthicum to lock the apartment door behind himself and Kidd and believes she walked behind them to the front door.  (Johnson 1/05 Dep. at 40, 43.)  Both Officers recall that Linthicum seemed to enjoy their sexual encounter, and neither remembers her affirmatively indicating that she wanted them to stop the sex or intercourse or "withholding" or "revoking" consent.  (See, e.g., Kidd 1/05 Dep. at 24-25, 48; Johnson 1/05 Dep. at 31-35, 52-53.)  The Officers have testified that they did not think Linthicum was too intoxicated to consent to sex.  (Johnson 1/05 Dep. at 35-36; Kidd 1/05 Dep. at 29.)  Johnson has further testified that as a matter of "common sense," if not personal experience, he would expect a woman who did not want sex to "push [him] off" or "[t]ell [him] to stop, get off of her."  (Johnson 1/05 Dep. at 33-35, 49.)

Linthicum's testimony is consistent with Kidd's and Johnson's insofar as she recalls having oral sex with both Officers and intercourse with one (if not necessarily two), and also

---

[14] Kidd and Johnson also remember Linthicum moaning or talking during the sex or intercourse.  (Kidd 1/05 Dep. at 24; Johnson 1/05 Dep. at 33.)

does not recall either Officer making any physical or verbal threats.  Linthicum maintains, however, that she never invited or consented to sexual activity and that none would have occurred had Kidd and Johnson not been police.  She has testified that it was not until after the Officers were inside her apartment that she began to suspect that they were motivated by "something different" than a desire to ensure her safe return home.  (Id. at 43.)  She remembers watching Kidd and Johnson remove their gunbelts and toss them onto her couch as she sat on her bed approximately five feet away, and thinking that they "were past the step of being City officials" and that "something was wrong."  (Id. at 43, 45, 47-49.)  She has testified that she does not recall saying anything or otherwise "reacting" to the Officers after she began "focusing on the guns lying there." (Linthicum 11/02 Dep. at 131.)

Linthicum recalls only fragments of what happened next.  (Id. at 53; see also Linthicum 11/02 Dep. at 35, 37-38, 132.)  She primarily remembers "just complying, just being there," "pretty much incapacitated," "feeling like I was a third person, like I was just viewing what was going on," and speculates that "whatever I was told to do, I just did."  (Linthicum 3/05 Dep. at 51, 53-55, 60-61; see also Linthicum 11/02 Dep. at 131-32, 140.)  She recalls one of the Officers undressing and helping or telling her to partially undress,[15] and then performing oral sex on that

---

[15]  Linthicum cannot remember changing into different clothes, although she has acknowledged that she must have at some point.  (Linthicum 3/05 Dep. at 49-50; Linthicum 11/02 Dep. at 35-40.)  Linthicum has testified that she remembers waking up at some point and finding herself wearing "some lingerie or a negligee," but has also testified that she woke up the next morning wearing a sweatshirt.  (Linthicum 11/02 Dep. at 35, 38-40; Linthicum 3/05 Dep. at 50.)  Linthicum has testified that she was given an item of lingerie at Madonna's and wore it around the bar for a time before bringing it home with her, see Linthicum 3/05 Dep. at 9-11 and Linthicum 11/02 Dep. at 111-112, but the Court does not consider this latter testimony for purposes of the present motion because it is almost certainly inadmissible at trial under Federal Evidence Rule 412.  In any event, both Officers have testified that they did not see Linthicum in lingerie at Madonna's.  (Kidd 11/20 Dep. at 99; Kidd 1/05 Dep. at 33; Johnson 1/05 Dep. at 38.)

Officer as she lay on her bed and he stood and leaned over her.  (Linthicum 11/02 Dep. at 131-36; see also Linthicum 3/05 Dep. at 61.)  She remembers the second Officer pacing back and forth[16] and looking out her front window, apparently to check on the cruiser, as she engaged in oral sex with the first Officer.[17]  (Linthicum 11/20 Dep. at 37, 130, 134; Linthicum 3/05 Dep at 61.)  She remembers the first Officer asking her for condoms, calling the second Officer over to "participate," and directing the second Officer to place his penis in her mouth.  (Linthicum 11/02 Dep. at 139-140, 148; Linthicum 3/05 Dep. at 51, 53, 61.)  She then remembers the first Officer penetrating her vaginally as the second Officer engaged in oral sex with her.  (Linthicum 11/02 Dep. at 37, 140; Linthicum 3/05 Dep. at 61.)  Linthicum has testified that she remembers the Officers receiving a call on their radio and saying they had to go, but also that she does not remember their actual departure.  (Linthicum 11/20 Dep. at 36-37; Linthicum 3/05 Dep. at 54, 62.)  Her next clear recollection is of waking up the next morning to find her clothes on the floor and her front door ajar.  (Linthicum 11/20 Dep. at 40; Linthicum 3/05 Dep. at 54.)

Linthicum has testified that she does not recall ever asking the Officers to leave her apartment, crying in front of them, refusing or asking them to stop their sexual advantages, or otherwise struggling with them on the night of her alleged assault.  (Linthicum 3/05 Dep. at 49, 52-54; Linthicum 11/02 Dep. at 35, 41-44, 132.)  She has further testified that the sex and

---

[16] Kidd recalls pacing back and forth in nervousness and discomfort before the sex began. (Kidd 11/20 Depo. at 62-63, 66-68.) He attributes his nervousness and discomfort partly to the simple fact that he and Johnson were "out of our district and off our beat." (Id.)

[17] Linthicum has testified that she now believes the first officer was Johnson, and the second Kidd, but cannot be sure.  (See, e.g., Linthicum 3/05 Dep. at 53, 61.)  One source of confusion is that both Officers are named Robert.  Linthicum apparently did not know the Officers' surnames (or, alternatively, did not remember and recognize those surnames) until well after the alleged assault.  (See, e.g., Linthicum 11/02 Dep. at 72-73.)

intercourse were "not physically against my will," and that she could walk unaided and speak despite what she describes as her extreme intoxication.  (Linthicum 11/02 Dep. at 41-42, 133, 198.)  Linthicum contends, however, that she could not have *invited* the Officers to have sex with her, because it would be inconsistent with her nature or "makeup" to do so.[18]  (Linthicum 3/05 Dep. at 54-56; Linthicum 11/02 Dep. at 197.)  She has testified that she believed the Officers primarily intended "to have fun," with her and is "not sure where that would have went if [she] had not cooperated."  (Linthicum 11/02 Dep. at 211.)  But she maintains that she did not actively participate or cooperate in the sex or intercourse, noting that she was not "fondling" the Officers or otherwise "provoking" or "encouraging" them.  (Id. at 41-44, 197.)  Linthicum does not remember the Officers *verbally* demanding oral sex or intercourse, but also recalls that at least the Officer who had both oral sex and intercourse with her "just did it," apparently without asking her permission.  (Id. at 149.)

Linthicum says she understood at the time that the Officers' sexual contact with her was inconsistent with official "policy," or at least not "what police officers normally [or] stereotypically do."  (Linthicum 3/05 Dep. at 45-46.)  However, she insists Kidd and Johnson "were still police officers to me" because of what she characterizes as their "intimidation actions."  (Id. at 46.)  She says although Kidd and Johnson did not tell her they were going to have sex with her "because they had the power of police officers," let alone threaten to arrest or physically harm her for resisting, the fact that they "took their gunbelts off [and] threw them on the couch" – thus calling her attention to weapons that would previously have been partially

---

[18] Linthicum testified on one occasion that she "cooperated" with the Officers, but has suggested on others that her level of participation did not constitute "cooperation."  (Cf. Linthicum 11/02 Dep. at 197, 211.)

concealed by their uniform jackets – constituted "serious mental intimidation." (Id. at 46-48; see also Linthicum 11/02 Dep. at 44, 133-34.) She has testified that she felt she had no "choice" or "say" in the intercourse. (Linthicum 11/02 Dep. at 134.) Linthicum acknowledges that the Officers never removed the guns from their holsters or verbally referred to them, and presumes that they removed the belts in order to have sex with her. (Linthicum 3/05 Dep. at 48-49.) She further avers, however, that the fact that Kidd and Johnson "were uniformed police officers" was intimidating in itself. (Id. at 51-52.) She has also testified that she told or otherwise indicated to the Officers, "many times," that she was uncomfortable with or intimidated by the presence of their guns. (Linthicum 11/02 Dep. at 131.)

As noted above, Officers Kidd and Johnson were in full police uniform the night of November 29th, with badges and partially visible guns. (Kidd 1/05 Dep. at 18-19; Johnson 1/05 Dep. at 18-20.) They maintain, however, that they never used their powers as police officers to influence Linthicum. (Kidd 1/05 Dep. at 16-17; Johnson 1/05 Dep. at 18-19, 33.) Kidd has testified that he was "definitely acting in my private interest," and did not regard the sex as a means of carrying out his police duties or City or community business. (Kidd 1/05 Dep. at 19-20.) He recalls that he never raised his voice to Linthicum, placed his hand on his gun or referred to his gun, badge, or handcuffs in her presence, threatened to arrest or investigate her, or did anything else to force her will in the course of the night. (Id. at 17-19, 23, 35-36.) Johnson's testimony on these points largely echoes Kidd's. (Johnson 1/05 Dep. at 18-21, 24-26.)

### 2. Later Contact[19] Between Linthicum and the Officers[20]

_____

[19] Kidd has testified that sometime after he and Johnson left Linthicum's apartment and returned to "normal patrol," they discovered that Linthicum had left her purse in the back of the cruiser. (Kidd 11/02 Dep. at 109-111, 123-124.) Kidd remembers delivering it to the manager of Linthicum's apartment building, apparently after knocking on Linthicum's door and getting

While the sexual assault allegations in Linthicum's complaint pertain only to the night of November 29th to 30th, 2001, Linthicum and Johnson[21] both recall a later sexual encounter that Linthicum has also described as non-consensual. (See Linthicum 11/20 Dep. at 34.) On or around December 12, 2001, approximately two weeks after Kidd and Johnson's alleged assault of Linthicum, Johnson again visited Linthicum's apartment, and he and Linthicum again had oral sex. (Linthicum 3/05 Dep. at 63-65, 72-73; Linthicum 11/20 Dep. at 34.) Linthicum had just returned from a bar where she estimates she drank six beers and possibly hard liquor and recalls being very intoxicated, but Johnson has testified he was unaware of whether Linthicum had had anything to drink that night. (Linthicum 11/02 Dep. at 175-76, 184; Linthicum 3/05 Dep. at 63,

---

no response. (Id. at 123-124.) He acknowledges that this was "bad procedure," but denies he was trying to get rid of the purse and says he thought it would simply be more courteous and expedient than tagging and holding the purse as police property. (Id. at 124-25.) He recalls that they called Linthicum from Johnson's cell phone to ask her to pick the purse up or notify her that they would be dropping it off with her landlord, but does not remember whether they called before or after the drop. (Id. at 109-111, 123.) In any event, Linthicum remembers her building manager returning the purse to her apartment. (Linthicum 11/02 Dep. at 26-28.)

[20] Linthicum has also testified that she was verbally threatened by four off-duty police officers other than Johnson and Kidd, one of whom recognized her, claimed to be a friend of Johnson's, and told her to "back off." (Linthicum 11/02 Dep. at 101-103, 106-108, 155-60, 168.) Because this testimony appears to be largely hearsay not subject to an exception, the Court does not consider it for purposes of the present motion. (Id.)

[21] As discussed above, when Linthicum was first deposed in November 2002, she was "just now putting faces" to the Officers' last names. (Linthicum 11/02 Dep. at 72-73; see also supra note 17.) Johnson has since testified that he was the Officer who visited Linthicum on December 12th, 2001. (Johnson 1/05 Dep. At 6, 30-33, 41-42.) Kidd has testified that he was not aware of this second sexual encounter until well after the fact. (Kidd 1/05 Dep. at 25-27.) He has also testified to being upset that he had not been informed about the second visit, apparently because he perceived it as connected to or bound up with the events of November 29th to 30th, 2001. (Id.)

74-75; Johnson 1/05 Dep. at 41-42.)  It appears that Johnson called[22] sometime at or after

midnight to tell her he was outside and ask to come upstairs, although Linthicum's testimony on

this point is somewhat conflicted.  (Johnson 1/05 Dep. at 30-31; Linthicum 11/02 Dep. at 174-75,

179-81, 194; Linthicum 3/05 Dep. at 64-65, 73-75.)  Linthicum is fairly certain that he arrived

uniformed, in a police cruiser.  (Linthicum 3/05 Dep. at 75, 78; Linthicum 11/02 Dep. at 180.)

　　　Linthicum let Johnson into her building, probably by throwing her keys down from the

window or balcony as she often did to avoid going downstairs to admit visitors, and then either

opening or allowing him to unlock her apartment door.  (Linthicum 3/05 Dep. at 73-74;

Linthicum 11/02 Dep. at 182, 184-85; see also Johnson 1/05 Dep. at 31, 42-43.)  Linthicum

recalls that Johnson took off his gun belt and undressed in her living/bedroom area, then had her

perform oral sex on him.  (Linchium 11/02 Dep. at 186-90; Linthicum 3/05 Dep. at 63, 66, 75.)

She has testified that Johnson did not verbally demand oral sex and does not recall whether she

ever asked Johnson to leave her apartment or indicate that she didn't want him there.  (Linthicum

11/02 Dep. at 195-96.)  She recalls feeling nervous, unresponsive, and detached.  (Id. at 187,

196.)  After the sex, she remembers Johnson telling her he had to "get the car back," telling her he

"would come back," and grabbing her keys.  (Id. at 190-92.)  Linthicum recalls telling Johnson

she would let him back in without any intention of doing so, apparently to dissuade him from

taking her keys with him.  (Id. at 190-91.)

　　　Linthicum has testified that – as during her first sexual encounter with Kidd and Johnson –

she was not threatened with violence or arrest.  (Id. at 75-77.)  She does remember worrying that

---

　　　[22] Linthicum has testified that she may have received and returned one call from Johnson
in the days following his and Kidd's alleged assault, although Linthicum cannot be sure the call
was from Johnson and does not remember whether she actually spoke with the caller.
(Linthicum 11/02 Dep. at 159-60, 174.)

Johnson might have found out that she had called someone at the police district about the earlier encounter and come to confront her, and thinking that she did not want to see him.  (Part I.A.3.a, infra;  Linthicum 11/02 Dep. at 171-73, 178-80, 192-95.)  She remembers worrying that there might be "repercussions," from her conduct, that she might no longer be able to rely on the police for assistance, and that her safety was threatened.[23]  (Id. at 185-86.)

Linthicum has acknowledged that she could have called 911 from her home or cell phone instead of letting Johnson into her apartment, but did not do so.  (Linthicum 3/05 Dep. at 77-78.)  She has explained that she wanted to know what Johnson wanted to discuss and "where my – my standing was."  (Linthicum 11/02 Dep. at 185, 191.)  Nevertheless, Linthicum has testified that she and Johnson ultimately did not discuss her call to the district or related issues that night, explaining that "he didn't mention it, so I didn't."  (Id. at 91.)  With respect to the oral sex, Linthicum recalls feeling she "[had] no choice" but to submit, because she was "stuck in [a] cycle" of "mental intimidation" that began with Johnson and Kidd's alleged assault and was affected by Johnson's "being a police officer."  (Id. at 63-65, 75-78; see also Linthicum 11/02 Dep. at 196-97.)  She has testified that she may actually have felt *more* intimidated during this second encounter, because she was bothered by Johnson's familiar manner and the fact that he had apparently felt "comfortable" enough to return to her apartment after the alleged assault.  (Linthicum 11/02 Dep. at 196-97.)

Linthicum reported her alleged November 29th to 30th assault to the Cincinnati police Internal Investigation Unit ("Internal Affairs") around the time of her second encounter with

---

[23] Linthicum speculates that she might have been less fearful if Kidd had accompanied Johnson, and recalls thinking that "if anything were to happen to me it was while someone was alone."  (Linthicum 11/02 Dep. at 194-96.)

Johnson, and did not see either Officer Johnson or Officer Kidd again.  (See id. at 64-67 and Part I.A.3.a, infra.)  She avers that one or both of the Officers[24] called her repeatedly after the alleged assault, although her testimony on the precise number and content of calls or messages she received before Internal Affairs tapped her phone is somewhat inconclusive.  (See, e.g., Linthicum 3/05 Dep. at 67; Linthicum 11/02 Dep. at 17-19, 163-68; see also Part I.A.3.b, infra.)  Linthicum recalls that one caller said he'd heard a rumor that Linthicum was accusing him of rape, and that she denied the rumor.  (Linthicum 3/05 Dep. at 68; see also Linthicum 11/02 Dep. at 17-22, 107-108.)  She has also testified to receiving voicemail messages asking her to call back or "meet up" again.  (Id. at 69-70, 79.)  Kidd has testified that he called Linthicum "a handful of times" and spoke with her once or twice, but never threatened her or suggested she should not follow through with the investigation.  (Kidd 1/05 Dep. at 36.)  Similarly, Johnson has testified that he called Linthicum a few times and left one message, but never threatened her.  (Johnson 1/05 Dep. at 44-45.)  He does not recall any "negative" discussion of their past sexual encounters.  (Id. at 45.)

Linthicum has testified that she was confused by the personal tone of some messages she apparently received from the Officers, which she recalls "sounded like we were almost dating.[25]" (Linthicum 03/05 Dep. at 70, 78.)  She remembers answering at least one call during which the

_____

[24] Linthicum has testified that she cannot precisely identify (or at least recall) the officer who placed each call, in part because she did know at the time that both Kidd and Johnson are named Robert and her callers sometimes referred to themselves as "Rob."  (Linthicum 3/05 Dep. at 67-68; Linthicum 11/02 Dep. at 17.)

[25] Linthicum does not think she ever specifically mentioned on these calls that her sex the night of the alleged assault had been nonconsensual, and does not remember whether she asked not to be contacted after this or other calls.  (Linthicum 3/05 Dep. at 72.)  However, she also recalls that after a certain point, she "was just letting them talk on the tape. . . ."  (Id. at 79.)

caller identified himself as one of the people who had brought her home from the bar.  She recalls that the caller mentioned that she had been intoxicated, and said something to the effect that she didn't "remember and . . . didn't have a good time like they did."  (Id. at 79; 11/02 Linthicum Dep. at 15-17.)  Kidd has testified that he called Linthicum on December 17th and identified himself as "Rob," one of the Officers who had brought her home, and that Linthicum seemed not to remember him at first but later indicated that she did.  (Kidd 11/02 Dep. at 105; see also Kidd 1/05 Dep. at 36-37.)  He has testified that he may have been interested in more sex or another "date" with Linthicum, but was primarily trying to get U.C. basketball tickets.  (Kidd 11/02 Dep. at 115-116; see also Kidd 1/05 Dep. at 37-38.)  In any event, he remembers telling Linthicum that he and perhaps also Johnson would like to see her again.  (Kidd 11/02 Dep. at 115-116.)

Linthicum also recalls receiving at least one message from a "Rob," asking her to call him at a cell number.  (Linthicum 11/02 Dep. at 14-16.)  Linthicum has testified that she was "intimidated" by the repeated calls, and at least once she matched the numbers on her caller ID to numbers provided by Internal Affairs and confirmed "it was them calling me over and over." (Linthicum 3/05 Dep. at 68-69; Linthicum 11/02 Dep. at 20-21.)

**3.** **Reporting and Investigation**

**a.** **Linthicum**

In the ten days after her alleged assault on the night of November 29th to 30th, Linthicum did not report the incident to the police, but did discuss elements of it with a few friends and a counselor.  (See, e.g., Linthicum 3/05 Dep. at 56-58; Linthicum 11/02 Dep. at 22-25, 33, 98-100, 149-151.)  She also returned to Madonna's and spoke with the bartender, apparently in an effort to identify the Officers.  (Linthicum 11/02 Dep. at 108-09.)  Finally, shortly before contacting the

22

police, she placed an anonymous call to a local television station to seek "advice" on what to do next.  (Id. at 151-52, 200-203.)  In at least some of these initial conversations, Linthicum did not describe her sex with the Officers as assault or "rape."  (Id. at 23-26, 203-207.)  She attributes this omission to her shame about the incident and her initial, mistaken feeling that she was at fault for what had happened.  (Id.)

Linthicum says she hesitated to report her alleged assault to the police because she was not sure she would have any "recourse," and did so only after mustering the courage and realizing the incident was "weighing too heavy" [sic] on her.  (Id. at 149-151.)  Around the time of her second encounter with Officer Johnson, Linthicum called the police department to say that on-duty officers had come to her house and had sex with her.  (Id. at 149-151, 171-75, 178-79, 192-93; see also Linthicum 3/05 Dep. at 64-65.)  Linthicum apparently did not describe the November 29th to 30th incident as "rape" during this call, although she does not recall her exact wording.  (Id. at 22-23, 198; Linthicum 3/05 Dep. at 82.)  She has testified that she was still confused as to what had happened on the night of November 29th to 30th, 2001, and unsure about whether it satisfied the formal definition of rape.  (Linthicum 11/02 Dep. at 22-23, Linthicum 3/05 Dep at 65-66.)

### b.     Initiation of Internal Affairs Investigation

Linthicum recalls that when she called the police to report the November 29th to 30th incident, the sergeant she reached indicated that she would pass on the information and also asked to come speak to Linthicum in person that evening.  (Id. at 171-73.)  Linthicum initially agreed to the visit but later called back to cancel it, she says because she did not want to be involved in an investigation and feared for her safety.  (Id. at 172-74.)  Despite her attempted cancellation, sometime the following day – also the day after Linthicum's second encounter with Officer

Johnson – Internal Affairs representatives arrived at Linthicum's residence.  (Id. at 178-79, 192-93; Linthicum 3/05 Dep. at 66-67, 104-05.)  Linthicum was questioned and taken to the emergency room for a physical examination.  (Linthicum 3/05 Dep. at 66-67, 103-108.)  Internal Affairs also dusted Linthicum's apartment for prints, took some items as evidence, and – some time later, after Linthicum called to complain about receiving intimidating phone calls – tapped Linthicum's phone and gave her the Officers' phone numbers.  (See, e.g., id. at 53, 59-60, 68-69.)

Linthicum broke off contact with Internal Affairs sometime in the spring or summer of 2002.  (Linthicum 11/02 Dep. at 102-106.)  She recalls losing faith in the investigation after being told, only shortly before an official press release, that the Officers had been cleared of criminal wrongdoing and that the incident would likely be mentioned on the news.[26]  (Id.)  However, Internal Affairs continued investigating Linthicum's case until August 2002, when it issued a report on the Officers' misconduct.  (See Part I.A.5.a, infra).

### c.  Officers Kidd's and Johnson's Initial Failure to Report and Denials of Contact with Linthicum

Officers Kidd and Johnson did not make a "signal 39" call, indicating that they were transporting someone in their cruiser, before driving Linthicum to her apartment on the night of November 29th to 30th.  (Kidd 11/02 Dep. at 91.)  They also did not note the run to Linthicum's apartment on the night's time sheets.  (See, e.g., id. at 88-90, 114.)  Kidd has testified, however, that he and Johnson did not always make signal 39 calls or otherwise report trips out of their district, so long as those trips were reasonably short.  (Id. at 91-92.)  He does not recall any

---

[26] Linthicum has complained and testified that she was terminated shortly after warning her boss at the time about the upcoming press release. (Id. at 46-48; see also Linthicum 3/05 Dep. At 65-66 and Complaint, doc. #24 at 4 ¶16.)  She has also testified that public gossip about the incident drove her to quit another job.  (Linthicum 11/02 Dep. at 51-52.)  The City's motion does not address these employment contentions.

discussion about not reporting the incident on his and Johnson's time sheet. (Id. at 90.) Both Officers have testified that they did not discuss the incident with anyone on the force, other than each other, until being contacted by Internal Affairs. (Johnson 1/05 Dep. at 28-29; Kidd 1/05 Dep. at 21.)

Kidd has testified that once he and Johnson learned about the pending investigation, they agreed to testify that they had never had sex with Linthicum. (Kidd 11/02 Dep. at 116-117.) On May 6, 2002, both Officers were interviewed by Internal Affairs. (See, e.g., doc.#51, Ex. 2 (City Brief to Kidd Arbitrator) at 12-13.) Internal Affairs first interviewed Kidd, who denied knowing Linthicum, being in her apartment, or engaging in sexual activity with her. (Id.; see also doc. #51, Ex. 7 (Kidd Arb.) at 23-33.) Internal Affairs then interviewed Johnson, who initially denied and later confessed to his and Kidd's sexual activity with Linthicum. (See doc #51, Ex. 3 (Johnson Arb.) at 4-5; see also doc.#51, Ex. 2 at 12-13.) Kidd was then given the opportunity to sit for a second interview, in which he also confessed to the sexual activity. (See Kidd Arb at 12-13; doc.#51, Ex. 2 at 12-13; Kidd 11/02 Dep. at 116-120.)

### 4. The Cincinnati Police Disciplinary Code and Investigative Process[27]

The written disciplinary rules applicable to Cincinnati police officers are codified in the City's Manual of Rules and Regulations and Disciplinary Process for the Cincinnati Police Division[28] (hereinafter "disciplinary code").[29] (See Affidavit of Cincinnati Police Chief Thomas

---

[27] The record includes some limited additional facts on training of Cincinnati police officers. The Court does not include those facts here because it concludes that Linthicum's allegation of inadequate training is beyond the scope of her complaint. See infra Part III.C.3.a.

[28] Although the record is not entirely clear on this point, it appears that the current disciplinary code was adopted by the Cincinnati Police Chief, possibly with input from the City Manager, after it was drafted by a "process improvement team." (See, e.g., Affidavit of Cincinnati Police Chief Thomas Streicher ("Streicher Aff.") at 1 ¶¶ 1-3 and Ex. B at 4 (cover

Streicher (hereinafter "Streicher Aff."), doc. #47, at 1 ¶ 2.)  The code contains a series of sections

outlining disciplinary rules in various subject areas.  (Id., Ex. A at 9-16.[30])  It also contains two

separate sections addressing penalties for violations of these rules.  Section Thirteen provides in

relevant part that officers may be dismissed if "proven guilty of" "incompetency," "dishonesty,"

"drunkenness," "insubordination," "immoral conduct," "neglect of duty," "failure of good

behavior," or "discourteous treatment of the public."  (Id. at 1-2 ¶ 5 and Ex. A at 22.)  Section

Fifteen, added in 2000, establishes a detailed matrix outlining specific penalties for an officer's

first, second, third or fourth violation of each disciplinary rule within a specified period.[31]  (Id. at

1 ¶ 3 and Ex. A at 22-25.[32])  Cincinnati Police Chief Thomas Streicher ("Chief") has averred that

the matrix was added to the code "in an effort to address concerns regarding the uniformity,

fairness, and consistency" of police discipline.  (Id. at 1 ¶ 3.)  However, he also contends that the

matrix should not be interpreted to *preclude* dismissals under Section Thirteen.  (Id. at 1-2 ¶¶ 5,

10.)  Indeed, the Chief has testified that he "still does have a tremendous amount of latitude and

---

page of code signed by Police Chief); see also Deposition of Cincinnati Police Chief Thomas
Streicher, January 7, 2005 ("Streicher Dep.") at 6, 7, 12, 62-63, 65-66 (describing City Manager
as final disciplinary authority).)

[29] The Court uses the term "code," rather than "policy," to minimize any potential
confusion with the general 42 U.S.C. § 1983 requirement, analyzed at Part III.C below, that a
constitutional injury flow from some state or municipal "policy" or custom.

[30] All of the subsections referenced here appear in the "Rules and Regulations" section of
the code.  Exhibits are referenced by their docket page numbers, not their original document
page numbers.

[31] The default period is three years, but some individual violations are measured on other
periods.  (Id. Ex. A at 22-25.)

[32] Exhibits are referenced by their docket page numbers, not their original document page
numbers.

discretion and is not bound solely by [the] matrix . . . ."  (Deposition of Cincinnati Police Chief Thomas Streicher, January 7, 2005 (hereinafter "Streicher Dep.") at 16.)

The disciplinary code also outlines the internal department procedures for investigating suspected rule violations and disciplining violating officers.  (Id., Ex. A at 16-20.)  Where misconduct is alleged, the Internal Affairs section prepares an investigation report for the Chief describing the charges and recommending action or case closure.  (Id. at 17; Streicher Dep. at 5, 62-65.)  Wherever the Chief determines that there is sufficient evidence to support a finding of a violation, the offending officer is given a pre-disciplinary hearing on the charges before another officer – typically a captain – appointed by the Chief.  (Streicher Dep. at 62-65; see also Streicher Aff., Ex. A at 17-18.)  The hearing officer decides whether to sustain the charges and submits a report with this recommendation, and any proposed "disciplinary action" and/or "corrective measures," to the Chief.  (Streicher Aff., Ex. A at 19; see also Streicher Dep. at 62-65.)  While the text of the disciplinary code suggests that the Chief may then take "final" action, the Chief has testified that the City Manager reviews the recommendations and makes the "ultimate decision" about what discipline to impose.  (Streicher Dep. at 65-66; see also id. at 6, 7, 12, 62-63 and doc. #51, Ex. 2 (City Brief to Kidd Arbitrator) at 5, 20.)

The primary disciplinary options for police officers, referenced at Sections Thirteen and Fifteen of the disciplinary code, are written reprimand, suspension, demotion, and dismissal.[33] (Id. at 19-20.)  Officers may appeal suspensions, demotions and dismissals for hearing and arbitration, pursuant to a collective bargaining agreement between the City and the Fraternal

---

[33] The code also provides for "[w]ithdrawal of outside employment privileges when the outside employment is the subject matter of the disciplinary proceeding or action."  (Id.) Potential "corrective measures" include oral reprimand, training, and referrals.  (Id.)

Order of Police, the police officers' union ("Union").  (Streicher Dep. at 7-8, 17, 61.)  Officers also have the option of requesting a hearing before the Civil Service Commission, although the Chief has testified that officers generally select arbitration rather than Commission appeals.[34] (Streicher Dep. at 24-25.)  He has further testified that in his experience, "100 percent" of disciplinary *terminations* are appealed to arbitration.  (Id. at 56.)  According to the Chief, the City and Union select arbitrators by alternately striking names from a common list until only one candidate remains.  (Id. at 66-67.)

The Chief has described the arbitration process as one "the City . . . is bound by contract to accept" under its collective bargaining agreement with the Union.  (Streicher Dep. at 7-8; see also id. at 23, 61-62.)  He recalls that in certain cases where officers have been dismissed for misconduct and then reinstated by arbitrators, a "small percentage" of the force has become demoralized.  (Id. at 22.)  However, the Chief has also testified that he believes even successful appeals help deter inappropriate police conduct, noting that he is not aware of any officers who have repeated charged conduct after obtaining a reversal of or reduction in penalties.  (Id. at 8-9.)

The police disciplinary code does not explain whether, or under what circumstances, the City or police department may appeal arbitrator or Commission rulings reversing or reducing a police discipline order.  (See Streicher Aff., Ex. A at 20-21.)  The Chief has testified that so long as it appears that the arbitrators have "acted within their authority" under the law, he feels he doesn't "have any choice but to accept" their rulings.  (Streicher Dep. at 46.)  He has also suggested, however, that he sometimes provides opinions on whether to appeal individual arbitrations to the City Manager, who retains ultimate discretion to order appeals.  (Id. at 54-55.)

―――――――――――――――――

[34] The written disciplinary code does not mention the arbitration process.

28

### 5.    Investigation and Discipline of Officers Kidd and Johnson

#### a.    Investigation

As discussed above, Internal Affairs began its investigation into the misconduct surrounding Linthicum's alleged assault on or around December 12, 2001, when Linthicum first contacted the police department.  In August 2002, Internal Affairs published its investigative findings in a report ("IIS report").  (See Doc. #51, Ex. 1.)  The IIS report concludes that Officers Kidd and Johnson, by engaging in sex with Linthicum while on duty the night of November 29th to 30th, violated rules 1.03, 1.22, 2.05, and 2.11 of the disciplinary code.  (Id. at 8-10.)  Those rules provide that:

1.03    [Officers] shall exercise the responsibility and authority of the position which they are assigned in accordance with job specifications and work rules of that agreement . . . Conduct shall be in accordance with high ethical standards, both on and off duty.

1.22    [Officers] shall not verbally and/or physically mistreat persons who are in custody and shall protect them from mistreatment by others. [Officers] shall handle such persons in accordance with law and Department procedure.

2.05    [Officers] shall not play games, watch television or movies or otherwise engage in entertainment while on duty, except as may be required in the performance of duty. They shall not engage in any activities or personal business which would cause them to neglect or be inattentive to their duties.

2.11    [Officers] shall not conduct social or personal associations or relationship [*sic*] with another person while on duty which would impair the operation or efficiency of the Department.

(Id.; Streicher Aff. Ex. A at 9, 11, 13.)

The IIS report also[35] sustained charges that the Officers, by failing to report each others'

------

[35] The report also sustained charges relating to Officer Johnson's second, December 12, 2001 sexual encounter with Linthicum, as well as both Officers' handling of the purse Linthicum left in their cruiser the night of November 29th to 30th.  (Id. at 10-13; see also supra note 19.)

on-duty sexual activity and lying about this activity to Internal Affairs, violated rules 2.13 and

5.01 of the disciplinary code, which provide:

> 2.13    Any [officer] becoming aware of, or receiving a complaint regarding any infraction of Department regulations or violation of City ordinance or State law by Department personnel, excepting civil matters arising outside the scope of the member's employment . . . shall immediately report such conduct to his supervisor should the matter come to the member's attention while on duty. . . .

> 5.01    No [officer] shall knowingly make a false verbal statement in the performance of their official duty or knowingly state, enter, or cause to be entered on any official documents any false information. . . .

(Doc. #51, Ex. 1 at 13-15; Streicher Aff. Ex. A at 13, 15.)

The IIS report does *not* charge Officers Kidd and Johnson with a violation of rule 1.13,

which provides that:

> 1.13    [Officers] shall not at any time use or attempt to use their official position, badge, or credentials for personal or financial gain.
>         A.  Is directed towards a person with whom the [officer] expects a sexual favor in lieu of performing an official act or responsibility.

(Streicher Aff. Ex. A at 10; see also doc. #51, Ex. 1.)  The section of the report summarizing IIS'

interview with Linthicum concludes as follows:

> It is Ms. Linthicum's belief, that since she was drinking she was not able to make a clear judgment.  However, Ms. Linthicum said there was no threat of force or force to perform the sexual acts.  This was consensual sexual conduct.

(Doc. #51, Ex. 1 at 3.)  The report also notes that Internal Affairs referred its findings to the

county prosecutor's office, which "determined this case did not meet the elements of Sexual

Battery (ORC # 2907.03) and would not further pursue this matter."[36]  (Doc. #51, Ex. 1 at 8.)

_____

[36] In her summary judgment response, Linthicum complains that the IIS report neglects to mention a separate investigation into a January 10, 2002 complaint that Officer Johnson had "sex while on duty in a bar."  (See doc. #50 at 29.)  However, there does not appear to be any evidence of this investigation before the Court.  (Cf. id. (referencing an "Exhibit 15" investigation report) and doc. #51 (Plaintiffs' Notice of Manual Filing of Exhibits) (listing and

**b.       Initial Disciplinary Recommendation (Termination)**

The IIS report does not recommend any particular discipline for Officers Kidd and

Johnson, but included, as an attachment, a copy of the disciplinary matrix from Section Fifteen of

the disciplinary code.  (Doc. #51, Ex. 1, attachment.)  According to the matrix, a first violation of

rule 5.01 – which falls under the heading "Dishonesty" – is punishable by 10 or more days'

suspension, demotion, or dismissal.  (Id.)  The maximum punishment associated with any of the

other rules listed above is a three to five-day suspension.  (Id. (Rule 1.22b, "physical abuse").)

The IIS report does not expressly reference Section Thirteen of the disciplinary code, which – as

noted above – provides for dismissal for a variety of violations other than "dishonesty."

On October 2002, following a hearing on the IIS report, a hearing officer recommended

that Officers Kidd and Johnson be terminated from the police force.  (Streicher Aff. at 2 ¶ 6.)  The

Officers were terminated on December 12, 2002, after Police Chief Streicher and the City

Manager approved the hearing officer's recommendation.  (Id. at 2 ¶¶ 6-7.)  Chief Streicher avers

that the City's ultimate decision to terminate Officers Kidd and Johnson was "based upon the

[d]isciplinary [p]olicy as a whole, and not solely upon" the matrix.  (Id. at 2 ¶ 6.)

**c.       Arbitration and Reinstatement**

In early 2003, both Officers appealed their dismissals to arbitration.  (See, e.g., doc. #51

Ex. 3 (hereinafter "Johnson Arb.") at 2; Ex. 7 (hereinafter "Kidd Arb.") at 2.)  The City contended

that under the terms of the collective bargaining agreement, it had just cause to fire the Officers

under not only rule 5.01 and other rules cited in IIS report, but also other police misconduct rules

---

attaching Exhibits 1-14.).)  In any event, according to Linthicum, Johnson's other case was
"closed as unfounded in December 2002" and apparently did not result in any discipline.  (Doc.
#50 at 29.)

and the general provision for dismissal in cases of dishonesty under Section Thirteen of the disciplinary code. (See, e.g., doc. #51 Ex. 2 (City's Brief to Kidd Arbitrator) at 2-3, 5-9, 17, 21-36.) It also reasoned that the matrix was intended primarily to guide hearing officers in their disciplinary recommendations to the Police Chief and City Manager, and as such should not be mechanically applied in the final imposition of discipline. (See, e.g., id. at 4-5, 33-35.) The Union responded that the matrix should be applied strictly, that the only rule violation charged against the Officers that provided for first-offense dismissal was Rule 5.01, and that dismissal under Rule 5.01 was too harsh a penalty in light of the fact that the Officers recanted their false testimony and lacked notice, at the time of their Internal Affairs interviews, of recent amendments to the rule. (See, e.g., Kidd Arb. at 7-10.)

In August 2003, the arbitrators issued final reports finding that the Officers' dismissals were unsupported by the police disciplinary code and associated practices. As a threshold matter, both arbitrators relied solely on the specific rule violations charged in the IIS report, and the associated penalties outlined in the matrix at Section Fifteen of the disciplinary code, to determine the appropriate measure of discipline.[37] (See, e.g., Kidd Arb. at 35; Johnson Arb. at 41.) The arbitrators also vacated the Officers' specific charges, under Rule 5.01, for lying to Internal Affairs about their sexual activity with Linthicum. (Kidd Arb. at 23-33; Johnson Arb. at 36.)[38]

---

[37] Kidd's arbitrator reasoned that the City could not rely on Section Thirteen as a basis for dismissal because the Officers had never been charged with a "violation" of that section or given a fair opportunity to contest its application in their pre-disciplinary hearings. (Kidd Arb. At 33-35.) Johnson's arbitrator found that the matrix should be strictly applied because of record evidence indicating it had been strictly applied in the past. (Johnson Arb. at 41.)

[38] Kidd's arbitrator reasoned that the City waived its discretion to enforce Rule 5.01 against Kidd when Kidd was allowed to sit for a second Internal Affairs interview with the expectation that his new testimony would replace his old, false testimony. (Kidd Arb. at 23-33.) Johnson's arbitrator relied on a similar waiver theory, as well as the Union's alternative theory

The arbitrators then determined that without the Rule 5.01 violations, the maximum penalties applicable under the matrix were unpaid suspensions of three (for Kidd) to five (for Johnson) days. (Kidd Arb. at 35; Johnson Arb. at 41-42.) The arbitrators thus ordered the City to reinstate the Officers with full back pay and benefits, exclusive of the suspension days. (Kidd Arb. at 35; Johnson Arb. at 41-42.)

### d.  Reactions to Discipline and Reinstatement

Police Chief Thomas Streicher has testified that he was surprised to see Officers Kidd and Johnson reinstated by the arbitrators. (Streicher Dep. at 26.) He also recalls that he thought the arbitrators' rulings should be appealed, and has testified that he "would have offered [his] opinion" on this matter to the City Manager or legal department. (Id. at 54-55.) In any event, it appears that the City did not appeal either arbitrator's ruling. (Id. at 54-56.) Kidd and Johnson were reassigned to uniform patrol in different districts. (Id. at 25-26.)

Kidd has testified that he had no reason, before November 29th, 2001, to believe the police department would condone or excuse his sexual activity with Linthicum. (Kidd 1/05 Dep. at 7, 21-22.) Indeed, he believes that even before November 29th, 2001, he understood that he could be fired for having sex on duty and possibly also for lying to Internal Affairs. (Id. at 10-12, 49-50.) Nonetheless, he recalls that he probably did not consider the potential penalties for his misconduct on the night of November 29th to 30th, 2001 until approximately April 2002, when he learned about Internal Affairs' investigation. (Id. at 7-8.) He has explained that while he did not understand the disciplinary code to encourage his sex with Linthicum or help him evade

---

that – due to a clerical error in recording an April 2002 rule amendment – the Officers did not have notice that dishonesty was punishable by dismissal when they sat for their May 2002 Internal Affairs interviews. (Johnson Arb. at 37-41.)

discipline for it, he also did not expect the department to find out about the sex.  (Id. at 8-9, 49-50.)

Like Kidd, Johnson has testified that he did not expect to get caught having sex on duty and did not consider the possibility that he could be fired for his conduct on November 29th to 30th, 2001 until approximately April 2002.  (Johnson 1/05 Dep. at 7-10, 16-17, 26-27, 54.)  He has also testified that he understood sex on duty and lying were terminable offenses,[39] that the police department had the right to discipline him, and that nothing in the disciplinary code encouraged him to engage in sex with Linthicum.  (Id. at 8, 16-17, 54-55.)  Nonetheless, Johnson has said he was not surprised to learn he would be able to keep his job:

> Johnson:   No, I wasn't surprised. I thought I would have at least got, you know, three weeks to a month at the most. I didn't – you know, I didn't think as far as when I was looking at the – the penalty as far as the matrix. You know, there was a possibility that I could get terminated, but I didn't think I would get terminated.
>
> Q:   Why didn't you think you would?
>
> Johnson:   Well, I mean, I was just going down, you know, just looking at the matrix. And, you know, I didn't know that I was going – I didn't think I was going to get fired. I mean, I thought maybe they would warrant me a hefty suspension without pay.
>
> Q:   Okay. And a hefty suspension would be three weeks to a month, in your opinion?
>
> Johnson:   Exactly.

(Id. at 46.)

### 6.    Investigation and Discipline of Other Cincinnati Police Officers

#### a.    Discipline of Other Officers

---

[39] It is unclear from Johnson's testimony whether he knew this on or before November 29th to 30th, 2001.  (See id. at 16-17, 54-55.)

Chief Streicher has attested that between 1996 and spring 2005, the City terminated two other police officers, Lonnie Grizzel and Patrick Knight, for "sexual misconduct reported by a citizen." (Streicher Aff. At 3 ¶¶ 14-15.) Officers Grizzel and Knight were never reinstated. (Id.) Linthicum submits, however, that at least two additional Officers – Rolando Underwood and Andre Ewing – have been terminated and reinstated after engaging in sexual misconduct. (Doc. #50 at 20.) Officer Underwood allegedly engaged in sex on duty and – on a separate occasion – handled his department-issued weapon in a potentially threatening manner while engaging in off-duty sex. (See Doc. #51, Ex. 10A (Underwood Arbitration Decision) at 6-12.) The City did not specifically discharge Underwood for sexual misconduct, but rather for "dishonesty, neglect of duty and failure of good behavior." (Id. at 2, 7 n. 2.) Officer Ewing, by comparison, was dismissed for sexual misconduct after he allegedly "used his position of authority as a police officer to extract sexual favors" from three female prostitutes. (Doc. #51, Ex. 10B (Ewing Arbitration Decision) at 3-6.) Both Officers were reinstated after appealing their discharges to arbitrators, Underwood with a sixty-day suspension and Ewing with full back pay and benefits. (Doc. #51 Ex. 10A at 25-26; Ex. 10B at 17.)

Linthicum also cites City records indicating that between 1994 and 2004, nineteen Cincinnati police officers appealed their terminations for misconduct to arbitrators; that all of these appeals resulted in reinstatement, and that the City appealed only one of the arbitrators' reinstatements. (Doc. # 50 at 21-22 (citing doc. #51 Exs. 10A-R and 10C); see also Streicher Dep. at 19-22.) She alleges that at least four of the Officers engaged in serious misconduct after being reinstated to the police force, although it does not appear that any of this later misconduct was sexual in nature. (Doc. #50 at 25 (citing Streicher Dep. at 20-21, 28.) Linthicum does not

35

specify how many of the nineteen reinstated officers were initially terminated for *sexual assault* or other alleged violations of private citizens' constitutional rights, as opposed to violations of internal police procedures or other governing laws, regulations or rules.[40]  Nor is it entirely clear how many of the reinstatements or instances of later misconduct took place before Johnson's and Kidd's alleged sexual assault of Linthicum on the night of November 29th to 30th, 2001.[41]

### b.  Investigation of Other Officers or Incidents

Linthicum cites several police misconduct cases, other than Kidd's and Johnson's, where she contends the City declined to fully investigate and pursue, through formal charges, officers' most serious infractions under the disciplinary code.  She notes that Officer Underwood, whose termination and reinstatement are discussed above, was never specifically charged with using his gun "to intimidate" a woman into engaging in sex with him.   (Doc. #50 at 29; see also generally doc. #51 Ex. 10A.)  She also notes that Officer Lonnie Grizzel, who was terminated and never reinstated, was "only charged with public indecency" after making sexual advances she contends constituted felony misconduct.  (Doc. #50 at 29-30 (citing Harmon v. Grizzel, No. 1:03-cv-169, 2005 WL 1106975, at *2-3 (S.D. Ohio Apr. 21, 2005.).)  She suggests that Grizzel's police supervisor, the victim's boyfriend, deliberately suppressed this charge by telling the victim not to report it.  (Id.)  Finally, Linthicum notes that Officer Joshua Phillips was terminated in early 2003 on charges of dishonesty arising out of an incident where he allegedly struck a citizen with his

---

[40] The arbitration records submitted by Linthicum suggest that at least a few of the terminations stemmed from police officers' violations of drug abuse policies or traffic rules.

[41] Not all of the arbitration decisions bear clear dates of issue.  However, it appears that at least one of the decisions – other than the Kidd and Johnson decisions discussed above – was issued after November 2001.  (See Doc. #51 Ex. 10 A-R, Arbitration Opinion and Award of Officer Terrence Dobbins (dated July 19, 2002).)

private truck, but was not specifically charged with "excessive force for using his vehicle as a weapon."  (Doc. #50 at 29; see also generally doc. #51 Ex. 10D.)

**c.  Prevailing Attitudes and Rumors**

In addition to the evidence of specific investigations and disciplinary proceedings discussed above, the record includes some limited deposition testimony on general police attitudes towards misconduct and discipline.  Chief Streicher has testified that there is some "small percentage" of the force that "probably becomes demoralized in some fashion when there are [officers] reinstated who probably, the majority of the [force] believes should not have been, they should have been dismissed because of their conduct."  (Streicher Aff. at 22.)  Officer Kidd has testified that "a lot of officers' names [have flown] around with the playboy title or man in blue," and that he knew before the alleged assault that some members of the force were known for having romantically interested women or so-called "beat wives" on their patrols.  (Kidd 1/05 Dep. at 40-42, 52-59.)  He has also testified that the term "beat wife" does not necessarily mean that the officer and woman are romantically engaged, although "there very well may be some mutual attraction."  (Id. at 40-41, 54-55, 58-59.)  In any event, Kidd has testified that he could not identify any specific officers as the target of such rumors.  (Id. at 53.)  He has also testified that he is reasonably sure he never heard any rumors, before his and Johnson's alleged November 2001 assault of Linthicum, about other officers engaging in on-duty sex and avoiding discipline.  (Id. at 20-23, 40-42, 53-54.)  Johnson's testimony on these points, while less explicit, generally mirrors Kidd's.  (See Johnson 1/05 Dep. at 26-27, 29-30.)

**B.  Procedural Background**

Linthicum sued the City and Officers Johnson and Kidd on July 1, 2002 and filed her

37

Second Amended Complaint on December 2, 2003.  (Docs. ##s 1, 24.)  Linthicum's specific

claim against the City, brought under 42 U.S.C. § 1983, is that the City's "express disciplinary

policy and matrix of discipline . . . result in no effective discipline for even outrageous and

unconstitutional conduct by police officers, and in this instance, encouraged said conduct [and]

condoned and ratified the constitutional[42] deprivation[s]" she allegedly suffered at the hands of

Johnson and Kidd.  (Doc. #24 at 4-5 ¶ 19.)  Linthicum also contends that the City "over the

course of several years has persistently failed to discipline police officers who have violated the

civil rights of citizens and has engaged in a municipal policy of ratifying said unconstitutional

conduct."  (Id. at 5 ¶ 21.)

On November 25, 2003, the City moved to dismiss Linthicum's claims under Rule

12(b)(6) of the Federal Rules of Civil Procedure, alleging that Linthicum consented to intercourse

with Officers Johnson and Kidd and therefore suffered no constitutional injury.  (Doc. #23; doc.

#40 at 5.)  The City further reasoned that it could not be liable for the officers' allegedly unlawful

conduct because the Officers did not act pursuant to official City policy or custom at the time of

the alleged assault and Linthicum had not otherwise linked her alleged injuries to any City policy.

(Doc. #23; doc. #40 at 5.)  The Court denied the City's motion, finding that the question of

consent turned on material factual issues that could not be resolved in a Rule 12(b)(6) posture,

and also that Linthicum had sufficiently "alleged both ratification and a causal link between the

---

[42] In addition to alleging violations of the Fourth and Fourteenth Amendments to the
federal constitution, Linthicum alleges intentional infliction of emotional distress and assault and
battery under Ohio law.  (See Doc. #24 at 5-6 ¶¶ 25-27 and Part IX.c.)  Linthicum's state-law
claims lie only against Officers Johnson and Kidd, and are not at issue here.  (See doc. #40 at 7-
8; doc. #46 at 2.)

City's disciplinary policy and her injury" to survive a motion to dismiss.  (Doc. #40 at 6-7.)[43]

The City answered Linthicum's Second Amended Complaint on July 9, 2004 (doc. #41) and filed its present summary judgment motion (doc. #46) on May 16, 2005.  In its present motion, the City renews its 12(b)(6) contention that Linthicum and the Officers' sex was consensual and therefore did not give rise to any constitutional injury.  (Doc. #46 at 12-15.)  The City also asserts that Linthicum has not shown that the Officers acted "under color of state law" and pursuant to City "policy" or "custom" in carrying out her alleged assault, as 42 U.S.C. § 1983 requires.  (Id. at 8-12, 15-21.)

## II.    JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction over Plaintiff's claims against the City pursuant to 28 U.S.C. § 1331 and § 1343.[44]

Summary judgment is appropriate where there remain no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c).  The moving party has the burden of showing that there are no genuine issues of fact; the evidence,

---

[43] By the same Order, the Court denied the City's motion to strike Linthicum's secondary claim that the City has persistently ratified civil rights violations by its police force (doc #32), noting that the striking of pleading matters under Federal Rule 12(f) is a "drastic measure" reserved for clearly irrelevant material, and that Linthicum had shown no indication of abandoning this claim.  (Doc. #40 at 8.)  The Court also denied Linthicum's motion (doc. #35) to convert the City's 12(b)(6) motion to a summary judgment motion; struck references to Linthicum's deposition testimony from her responsive brief as improper under 12(b)(6); and denied Linthicum's motion to file a rejoinder to the City's reply memorandum on its 12(b)(6) motion (doc. #33) as moot in light of Linthicum's subsequent briefing on the City's motion to strike (doc. #32.)  (Doc. #40 at 1, 3-6, 8-9.)

[44] Linthicum's claims against the City are brought under 42 U.S.C. § 1983, which creates a cause of action only for certain violations of the *federal* Constitution and statutes. Linthicum has also raised state-law tort claims for intentional infliction of emotional distress and assault and battery, but those lie only against Officers Kidd and Johnson and are not presently before the Court.  (See doc. #24 at 5-6 and supra note 42.)

together with all inferences that can permissibly be drawn from that evidence, must be read in the light most favorable to the opposing party.  See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  The Court's task is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  A genuine issue for trial exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff."  Id. at 252.  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions," and not the province of the Court.  Id. at 255.

The evidence a court relies on to resolve a summary judgment motion should be admissible in content, although it need not be submitted in a form admissible at trial.  Bailey v. Floyd Cty. Bd. Of Ed., 106 F.3d 135, 145 (6th Cir. 1997) (citing Celotex Corp v. Catrett, 477 U.S. 317, 324 (1986)); see also Fed. R. Civ. P. 56(e) (requiring affidavits and other supporting documents to "set forth such facts as would be admissible in evidence").  Irrelevant evidence and hearsay not covered by an exception therefore "must be disregarded."  U.S. Structures, Inc. v. J.P. Structures, Inc., 130 F.3d 1185, 1189 (6th Cir. 1997) (internal citations omitted).

## III.    ANALYSIS

Linthicum's claims against the City are brought under 42 U.S.C. § 1983, which provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws [of the United States], shall be liable to the party injured in an action at law . . . .

42 U.S.C. § 1983.  Because Linthicum's claims against the City are entirely derivative of her

40

constitutional claims against Officers Johnson and Kidd, she cannot recover from the City unless she first establishes that the Officers violated her constitutional rights.  See, e.g., City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986).  To make the *City* liable for the Officers' conduct under 42 U.S.C. § 1983, Linthicum must make additional showings that the Officers acted both "under color of state law" and pursuant to City "policy" or "custom," in violating her rights.  See, e.g., Moore v. City of Paducah, 890 F.2d 831, 833 (6th Cir. 1990); City of Oklahoma City v. Tuttle, 471 U.S. 808, 817 (1985).  In its present Motion for Summary Judgment, the City contends that Linthicum cannot make any of these three showings.  For the reasons below, the City's Motion is **DENIED**.

> **A.      Officers' Violation of Linthicum's Constitutional Rights**

The Court begins with the City's argument that Linthicum has failed to "raise a genuine issue of material fact as to whether she was assaulted by Kidd and Johnson," and therefore cannot establish any constitutional injury that would be actionable under 42 U.S.C. § 1983.  (Doc.#46 at 12-13.)  As the Sixth Circuit has long recognized, the "right not to be sexually assaulted under color of state law" is a component of the "clearly established right . . . to personal security and to bodily integrity" enshrined in the substantive due process clause of the United States Constitution.  Doe v. Claiborne Cty., 103 F.3d 495, 507-508 (6th Cir. 1996).  The City now asserts that no reasonable jury could find that the sexual activity between Linthicum and the Officers on the night of November 29th to 30th, 2001 constituted non-consensual sexual assault, because the facts suggest Linthicum became voluntarily intoxicated that night, never physically or verbally resisted sexual activity with the Officers, engaged in certain arguably provocative conduct, and engaged in oral sex with Johnson approximately two weeks later.  (See, e.g., doc. #46 at 12-15;

41

doc. #55 at 8-12.)  The City reasons that because the Officers could not have violated Linthicum's constitutional rights by engaging in *consensual* sex with her, Linthicum cannot seek constitutional damages from the City under § 1983.[45]  (See doc. #46 at 13 (citing in part <u>Heller</u>, 475 U.S. at 799).)

This Court first addressed the consent issue in its July 2, 2004 Order denying the City's Rule 12(b)(6) motion to dismiss Linthicum's complaint for failure to state a claim.  (<u>See generally</u> doc. #40 at 6.)  There, the Court found Linthicum's allegations that she was incapacitated and helpless during her sex with Kidd and Johnson sufficient to establish a constitutional violation for pleading purposes.  (<u>Id</u>.)  The Court noted that "there appears to be a question of fact concerning consent," but found that the question would have to be resolved through examination of the evidence, rather than the pleadings alone.  (<u>Id</u>.)  The City argues that it is now entitled to summary judgment on this issue because Linthicum has utterly failed to "support [her initial] allegation that her sexual conduct was non-consensual."  (Doc. #46 at 13.)

The Court disagrees that there remains no genuine material dispute as to whether Linthicum consented to sex and intercourse with Kidd and Johnson on the night of November 29th to 30th, 2001.  While the transition from a dismissal to summary judgment posture does increase the burden on Linthicum, it does not alter the result here.  As noted above, because questions of

---

[45] Linthicum's complaint expressly alleges violations of both the Fourth and Fourteenth Amendments.  (Doc. #24 at 1, 5.)  The City's argument appears to more directly implicate Linthicum's Fourteenth Amendment due process or privacy right to bodily integrity, <u>see, e.g.</u>, <u>Doe v. Claiborne Cty.</u>, 103 F.3d 495, 506-507 (6th Cir. 1996), but is not labeled as such. The City also makes a passing argument to the effect that Linthicum was never in "custody," but this argument appears only on reply and in a separate portion of the brief.  (<u>See</u> doc. #55 at 7-8.) Because the City's motion does not directly challenge any other potential theories of constitutional violation raised by Linthicum's complaint, the Court limits its discussion to the issue of non-consensual sex or sexual assault, without expressing any opinion as to whether Linthicum's complaint could be construed to allege other theories of constitutional violation.

fact must ordinarily be reserved for a jury, summary judgment should be denied unless it appears that there remains no "genuine dispute" as to any material fact.  Linthicum has now testified, repeatedly and at length, that she did not consent to sexual activity with the Officers.  While she does not recall verbally or physically resisting sex or intercourse or asking the Officers to leave her apartment, she also alleges that she was extremely intoxicated by the time of her alleged assault, to the point where she can remember only portions of it.  The City reasons that Linthicum *must* have consented because – by her own testimony – the Officers apparently did not obtain sex by physical or verbal force.  (Doc. #46 at 13.)  It also suggests, by reference to both Linthicum's and the Officers' testimony, that Linthicum could not have been intoxicated to the point of incapacitation because she was apparently able to walk, to hold a conversation, and to lead the Officers to her apartment.[46]  (Id. at 13-15.)

The Court rejects the City's implicit invitation to equate absence of objection with the presence of consent.  The upshot of Linthicum's testimony is that she was too intoxicated to consent to sex or intercourse with Kidd and Johnson.  The Court is not aware of any controlling authority to the effect that engaging in sexual activity with an individual who lacks the capacity to consent does not constitute sexual assault.[47]  The Officers' testimony as to Linthicum's capacity

---

[46] The Court notes in passing that this characterization of the facts seems fundamentally at odds with the City's presentation at arbitration.  In its brief to the arbitrator who reviewed Officer Kidd's dismissal, the City emphasizes testimony by Kidd and others to the effect that Linthicum was "heavily intoxicated," "stumbling drunk," "impaired and vulnerable," and "needed assistance walking."  (See doc. #51 Ex. 2 (City Brief to Kidd Arbitration) at 10, 21, 33-34.)

[47] In fact, even some of the authority the City cites supports the proposition that sexual activity under these circumstances constitutes assault.  See, e.g., Mooneyhan v. Hawkins, No. 96-6135, 1997 WL 685423, at *4-5 (6th Cir. Oct. 29, 1997) (describing as "rape" police officer's intercourse with an "obviously intoxicated woman" who was "not in the frame of mind to make the decision to go to his apartment" and engage in sex with him.)  In its reply, the City cites non-

clearly conflicts with Linthicum's, and the Court cannot resolve that conflict without resorting to credibility determinations that are the province of the jury. See, e.g., Anderson, 477 U.S. at 255. More to the point for purposes of the present motion, the Court disagrees that there is enough *undisputed* evidence of Linthicum's "capacity" on the night of November 29th to 30th that no reasonable jury could find Linthicum was too intoxicated to consent to sexual activity by the time she and the Officers reached her apartment.[48]  This is particularly true in light of Linthicum's testimony that she drank heavily throughout the night of November 29th and may have continued to drink – becoming increasingly intoxicated – after meeting the Officers shortly after midnight on November 30th.

The City also suggests that Linthicum must have consented because the Officers have testified that she solicited and appeared to enjoy sexual activity with both Officers,[49] and because

---

binding authority for the proposition that if incapacity is induced by voluntary intoxication, it must be "extreme to the point of unconsciousness" and admit a "defense for reasonable mistake." (Doc. #55 at 10-11.)  Even assuming *arguendo* that these are the relevant legal standards – a point the City has not established – there would remain a genuine dispute of material fact as to whether Linthicum was unconscious during a portion of the sexual activity or (alternatively) whether the Officers were "reasonably" mistaken in their estimation of her consciousness.

[48] The Court notes in passing that even assuming *arguendo* that a reasonable jury found Linthicum was not sufficiently intoxicated to be incapacitated, it nonetheless could find that – as she has testified – she was coerced into sex because of the Officers' "mental intimidation." Because the City does not specifically challenge the legal sufficiency of this alternative theory of sexual assault, the Court need not discuss it here.

[49] The City also repeatedly stresses Linthicum's admissions that she "paraded around [Madonna's], in public, wearing a teddy which three men enticed her to model in exchange for purchasing for her."  (See, e.g., doc. #46 at 3, 13; doc. #55 at 7, 8 .)  The Court does not consider this evidence because it appears presumptively inadmissible under Rule 412, the federal rape shield rule.  Because the Officers have testified that they never observed Linthicum in lingerie at Madonna's, the admissions may also prove inadmissible under Rules 403 and 404.  The Court feels compelled to caution the City against further reliance on evidence of such questionable admissiblity.

Johnson and Linthicum have both admitted to engaging in oral sex on December 12, 2001, approximately two weeks after Linthicum's alleged assault by Kidd and Johnson. (Id. at 13-15.) Again, at the summary judgment stage, the Court may not simply substitute the Officers' alternative characterization of events for Linthicum's. The undisputed fact that Linthicum later engaged in *additional* sexual activity with Johnson, while curious, also does not eliminate the material dispute as to whether Linthicum consented to sex on the night of November 29th to 30th, 2001. Even assuming that Linthicum's conduct on December 12, 2001 *could* be admitted as probative of her conduct on November 29th,[50] the fact remains that Linthicum alleged that she did not consent to sex on December 12th, either. Rather, she has alleged that she was again intoxicated and still in the grip of the "mental intimidation" of her November 29th to 30th assault. A reasonable jury construing these December 12, 2001 facts in the light most favorable to Linthicum – and in connection with the other facts on the record – could still find that Linthicum did not consent to sexual activity on November 29th to 30th, 2001.

In short, the Court finds that there remains a genuine dispute of material fact as to whether Linthicum consented to sex and intercourse with Kidd and Johnson on the night of November 29th and 30th, 2001. The City's motion for summary judgment as to this issue is therefore **DENIED**.

B.   **State Action Under 42 U.S.C. § 1983**

To recover against the City under 42 U.S.C. § 1983, Linthicum must show not only that Kidd and Johnson violated her constitutional rights, but also that they did so while acting "under color of state law," rather than while engaged in "purely private conduct." Moore, 890 F.2d at

---

[50] For the reasons noted in its statement of facts, the Court defers its ruling on the ultimate admissibility of this evidence under Federal Rule 412. See supra note 2. Obviously, to the extent that the evidence proves inadmissible at trial, no jury could give it *any* weight.

833.  A public employee generally operates under color of state law "while acting in his official capacity or while exercising his responsibilities pursuant to state law."  West v. Atkins, 487 U.S. 42, 51 (1988) (internal citations omitted).  Conduct constituting "state action" for purposes of the Fourteenth Amendment also establishes conduct "under color of state law" for purposes of § 1983 liability.  Id. at 49; Lugar v. Edmonson Oil, 457 U.S. 922, 935 (1982); Moore, 890 F.2d at 833.

The City contends that a police "officer does not act under color of [state] law when he acts out of purely personal, private pleasure, without official purpose and without exercising his police authority."  (Doc. #55 at 2.)  It characterizes the clear evidence that on-duty sex was outside the scope of Kidd's and Johnson's police duties as dispositive,[51] arguing that "it is the nature of the act performed, not the fact that a police officer is on or off duty, or in or out of uniform[,] that determines whether the officer has acted under color of state law."  (Doc. #46 at 9 (citing Stengel v. Belcher, 522 F.2d 438, 441 (1975).)  Linthicum responds that § 1983 jurisdiction is not confined to those cases in which a plaintiff challenges behavior by a police officer who was acting in strict accordance with his official duties.  (Doc. #50 at 5-8.)  She reasons that such a construction would insulate municipalities from § 1983 liability in virtually every case of police misconduct, because an officer would presumably cease "fulfilling [his] duties" – and, by the City's reasoning, thus cease acting "under color of state law" – "at the exact

---

[51] Again, the City's position before this Court appears somewhat at odds with its prior contentions and findings in this case.  The IIS report on Kidd and Johnson charges the Officers with, *inter alia*, violations of disciplinary code provisions barring mistreatment of "persons in custody."  (See doc. #51, Ex. 1 at 8-9.)  In arbitration, the City cited with approval the statement of Kidd's disciplinary hearing officer that "[w]e really *as police officers* [had] the duty, responsibility to care for [Linthicum]" in her highly intoxicated state.  (Doc. #51, Ex. 2 (City Brief to Kidd Arbitrator) at 15.)  The City also cited the hearing officer's statement that "it's questionable *whether [the Officers] would have been able to accomplish the same thing if they didn't use their position and authority and stature as a Cincinnati Police Officer* to accomplish what they accomplished.  (Id. at 16 (emphasis added).)

moment [his] behavior became inappropriate."  (Id. at 5.)

The Court agrees that the City has construed "under color of state law" too narrowly.  It is true that a state actor's "private conduct, outside the course or scope of his duties, and unaided by any actual indicia of actual or ostensible state authority," does not arise "under color of state law."  Waters v. City of Morristown, 242 F.3d 353, 359 (6th Cir. 2001) (emphasis added). Nonetheless, "[i]t is firmly established that a defendant in a § 1983 suit acts under color of state law when he *abuses* the position given to him by the State."  West, 487 U.S. at 49-50 (emphasis added).  It follows that a defendant may act "under color of state law" either "while acting in his official capacity *or* while exercising his responsibilities pursuant to state law."  Id. at 50 (emphasis added).  All that is required, for § 1983 purposes, is that the official have "exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'"  Id. at 49 (citing in part United States v. Classic, 313 U.S. 299, 326 (1941).)  In other words, § 1983 is implicated not only where a state actor performs "an actual or apparent duty of his office," but also where "the actor *could not have behaved as he did without the authority of his office*."  Waters, 242 F.3d at 359 (emphasis added) (citing West, 487 U.S. at 49-50).

The City suggests that to preserve her § 1983 claim, Linthicum must show that Officers Kidd and Johnson were carrying out actual police "responsibilities" or duties when they allegedly assaulted her.  In fact, as the citations above make clear, Linthicum may also state a § 1983 claim by showing that Kidd and Johnson relied on their status as police officers to effect her assault and that their alleged deprivation of her constitutional rights therefore "related in some meaningful

47

way" to their governmental status.[52]  Waters, 242 F.3d at 359; see also, e.g., Lugar, 457 U.S. at

936 (citing Monroe v. Pape, 365 U.S. 167, 172 (1961)) ("claim of constitutional deprivation"

arises under § 1983 where "directed against a party whose official character is such as to lend the

weight of the State to his decisions.").

 The record evidence strongly suggests that Officers Kidd and Johnson acted "under color of

state law" in carrying out their alleged assault.  First, it is undisputed that the Officers were on duty,

in full police uniform, and driving a police cruiser on the night of November 29th to 30th, 2001.  The

City has correctly observed that a police officer does not *necessarily* act "under color of state law"

simply because he acts in uniform or on duty.  See Stengel, 522 F.2d at 441; see also McNeese v.

J.D. Vandercook, No. 97-6512, 1999 WL 133266, at *2 (6th Cir. Feb. 25, 1999) (internal citations

omitted) (on-duty police officer "does not act 'under color of law' when he acts out of purely

private interests.")  To the extent that an officer's police uniform, equipment or duty status

constitute natural "indicia" of his state authority, however, these elements are certainly *relevant* to

the question of whether that officer abused his police status or privileges – and thus acted "under

color of state law" – in violating another's constitutional rights.  See, e.g., Waters, 242 F.3d at 359

(emphasizing state actor's reliance on "indicia of actual or ostensible state authority" in

determining whether conduct occurred "under color of state law"); McNeese, 1999 WL 133266 at

*2 (emphasizing, in affirming § 1983 dismissal, district court's findings that police officer did not

use any official identification or equipment to "intimidate" or hurt plaintiff.)

 Linthicum has testified that she would never have allowed Kidd and Johnson to drive her

home – thus triggering the chain of events that led to her alleged assault – had they not been police

---

  [52] Linthicum must also show that the Officers' conduct flowed from some government
policy or practice, as discussed at Part III.C, infra.

officers. She has also testified that she believed it was within the scope of the Officers' discretion,[53] if not necessarily their formal duties, to ensure her safe return home. While the Officers contend that Linthicum had more sexual motives for soliciting or accepting a ride in their cruiser, and then inviting or allowing them to accompany her upstairs to her apartment, a reasonable jury construing the facts in the light most favorable to Linthicum could still conclude that Kidd and Johnson used or relied on their status as police officers to get Linthicum into a position that facilitated sexual assault. Even some elements of the *Officers*' testimony – such as Kidd's initial recollection that Linthicum appeared to be attracted to his police uniform, and that he took her for a "police groupie" – are consistent with that conclusion.

The City also suggests that even if the Officers used or relied on their police authority and cruiser to escort Linthicum home, it cannot be held liable under § 1983 because Officers could not have been acting "under color of state law" by staying to have sex and intercourse with Linthicum. (See, e.g., doc. #46 at 12.) Here, the City stresses the evidence that both Officers were – and apparently knew they were – subject to discipline for having sex or intercourse on duty. (Doc. #46 at 12, 16-18.) It also stresses Linthicum's own admission that she knew Kidd and Johnson were "past the step of being City officials" when they partially undressed and engaged in sex and intercourse with her. (Doc. #46 at 12.)

The Court declines to terminate the City's potential liability for Officer Kidd and Johnson's conduct at Linthicum's apartment door. As discussed above, a public official's constitutional violations may give rise to § 1983 liability even where those violations stem from conduct outside

---

[53] While it is unclear whether the Officers were authorized to leave their district to transport Linthicum home, they have testified that the police occasionally provide these rides. In any event, the City concedes that evidence that a police officer has at least "*purported* to be engaged in official conduct" may support a finding of state action. (Doc. #55 at 2.)

49

the scope of the official's official duties or actual authority.  See, e.g., West, 487 U.S. at 55-56 (§

1983 liability not limited by "the precise terms of [a state actor's] employment").[54]  Moreover, even

conduct outside the scope of an officer's *apparent* authority may be actionable under § 1983 so

long as "the actor could not have behaved as he did without the authority of his office."  Waters,

242 F.3d at 359.  In this case, there are at least two theories whereby a jury could reasonably

conclude that Officers Kidd and Johnson could not have entered Linthicum's apartment and

engaged in sex and intercourse with her were it not for their status as police officers.  First,

Linthicum has suggested that she allowed Kidd and Johnson to engage in sex and intercourse

because her *awareness* that they were armed police officers – even if they were not acting as such

at the time – was mentally intimidating to her.  The City has contested this assertion, stressing the

undisputed evidence that Linthicum was not physically or verbally threatened by the Officers, but

there remains at least a genuine dispute of material fact as to whether Linthicum felt coerced into

sex.  Second, even a jury unpersuaded by Linthicum's mental coercion testimony could reasonably

conclude that Linthicum was so incapacitated by alcohol by the time she and the Officers reached

her apartment that it would have been impossible for her to meaningfully consent to sex or

intercourse.  If so, it would appear that once the Officers relied on their actual or apparent authority

to escort Linthicum home, they had sufficient control over Linthicum to carry out her assault.[55]

---

[54] West involved a constitutional claim against a private individual providing state services on a contract basis, not a public official or employee such as a police officer.  See, e.g., West, 487 U.S. at 44.  However, because the "fair attribution" analysis for private parties is – all else being equal – often more searching, see, e.g., Lugar, 457 U.S. at 936-37, there is no reason to presume the cited principle would not apply with equal force to actual public officials.

[55] These two scenarios are not even mutually exclusive, in that Linthicum has testified she might never have accepted a ride from the Officers in the first place – let alone allowed them into her apartment – had she not been intoxicated.

The City cites several decisions from this Circuit dismissing § 1983 claims for the sexual torts of city officials – including some uniformed, on-duty police officers – on the grounds that the torts did not involve an abuse of authority or otherwise constituted "purely private" or "personal conduct." Those cases, however, distinguish themselves. In Waters v. City of Morristown, also discussed above, the Sixth Circuit affirmed the dismissal of § 1983 claims arising out of a part-time city alderman's harassment and abuse of a woman the alderman employed at his private veterinary clinic and developed a close personal relationship with. In his attempts to control plaintiff, the alderman had allegedly requested that the local police department monitor plaintiff's movements, attempted to interfere with the department's subsequent harassment investigation, and threatened to revoke a local cab company's license in retaliation for its transportation of plaintiff. See, e.g., 242 F.3d at 355-558. In finding that these facts were insufficient to establish § 1983 liability on the part of the city, the Court noted that the alderman "would have been able to pursue his harassment of [plaintiff] because of their close personal relationship and because of his status as her employer, even if he had not been" a city alderman Id. at 359-60. The Court also noted that to the extent the alderman tried to bring his limited *official* authority to bear on plaintiff, he had no formal and little or no practical influence on the police or cab company and was simply "'throwing his weight around' on peripheral matters that did not go to the heart of his harassing conduct." Id. at 359-60.

The cases of Mooneyhan v. Hawkins and Harmon v. Grizzel, while not directly binding on this Court,[56] also illustrate how the presence of a pre-existing relationship between plaintiff and

---

[56] The other controlling cases cited by the City are less factually parallel to Linthicum's, but in any event do not upset the general "under color of state law" principles discussed above. In particular, the cases confirm the relevance – among other factors – of indicia of or references to official authority. See, e.g., Neuens v. City of Columbus, 303 F.3d 667, 670-71 (6th Cir. 2002) (no police cruiser, badge, or uniform present, and no reference to officer's status as police officer, in assault involving off-duty police officer); Layne v. Sampley, 627 F.2d 12, 13 (6th Cir.

defendant alters the § 1983 "under color of state law" analysis in cases alleging an abuse of official power for sexual gain. In Mooneyhan, an unpublished opinion, the Sixth Circuit affirmed the dismissal of a § 1983 claim by a plaintiff who alleged that an off-duty police officer had raped her after escorting her home,[57] heavily intoxicated, from a bar. Mooneyhan v. Hawkins, No. 96-6135, 1997 WL 685423, at *1-2 (6th Cir. Oct. 29, 1997.) The plaintiff, like Linthicum here, alleged that the officer had used his status as a police officer to gain her trust and – through his use of his police status to help the plaintiff, who was underage, remain at the bar longer– help position himself to rape her. Id. at *3.

In holding that the officer had not "acted under color of state law," the Sixth Circuit noted that the plaintiff and officer had "known each other for approximately 10 months" before the alleged assault and "had developed a friendship" during which the plaintiff visited the officer's apartment twice, paged and spoke with him on several other occasions, invited him to her birthday party, and sought his advice on a friend's problems with her boyfriend. Id. It emphasized that while the officer had taken "advantage of an obviously intoxicated woman . . . who was not in the frame of mind to make the decision to go to his apartment" for sex, he had not "exercised or purported to exercise any authority as a police officer" in order to do so. Id. at *4-5. Rather, the facts indicated that plaintiff had simply "trusted [the officer] as a friend," that the officer "used his friendship to place him in a position to rape" plaintiff, and that any incidental abuses of police

---

1980) (off-duty officer's use of service revolver in fight); Stengel v. Belcher, 522 F.2d 438, 441 (6th Cir. 1975) (off-duty police officer's use of chemical mace and pistol in bar fight). While most of these cases involved conduct that the officers regarded as consistent with their public obligations as police officers, they do not establish that § 1983 liability lies *only* where officers believe themselves to be acting within the scope of their official duties.

[57] The officer drove plaintiff first to her house, then to his, in his personal car. Id. at *1-2.

authority earlier in the evening were thus not the "proximate cause" of her rape.  Id.

Harmon v. Grizzel, a more recent opinion from a sister court, also involved an alleged sexual assault by a police officer with a prior, personal relationship to plaintiff.  Plaintiff met the officer the year before the assault through her boyfriend, the officer's supervisor at the Cincinnati police department.  Harmon, 2005 WL 1106975 at *1-2.  They were not friends, but had met socially several times because of their common connection to the plaintiff's boyfriend.  Id. at *1-3.  In her deposition, the plaintiff had explained that she agreed to meet the officer privately the day of the alleged assault because she suspected her boyfriend was being unfaithful and thought the officer might have information about the infidelity.  Id. at *2-3.  In rejecting the plaintiff's argument that the officer had relied on his police authority to effect his assault, the Court reasoned that the officer had "used his personal relationship" with the plaintiff – specifically, his knowledge of and promise of information about her boyfriend – to encourage the plaintiff to meet him on the day of the assault.  Id. at *7.  Because the facts did not indicate that the officer's "could not have behaved as he did without the authority of his office," the Court found no basis for suit under § 1983.  Id.

In this case, there is no apparent dispute that Linthicum had never met – let alone had any personal relationship with – Kidd or Johnson before November 29th, 2001.  All else being equal, the apparent absence of any prior relationship between Linthicum and her alleged assaulters makes it far more likely that Linthicum would not have trusted Kidd and Johnson to escort her home had she not recognized them as police officers, understood courtesy rides to be within the scope of their authority, and placed some faith in those beliefs.  A reasonable jury construing the facts in the light most favorable to Linthicum could conclude that but for this initial trust, Linthicum would not have gone home with the Officers and therefore would not have been in a position to be sexually

53

assaulted – in her intoxicated state – in her apartment.[58]

In sum, while a jury must decide the ultimate question of consent,[59] there is ample evidence to show that – if Kidd and Johnson engaged in non-consensual sexual activity with Linthicum on November 29th or 30th, 2001 – that activity was "possible only because" the Officers were "clothed with the authority of state law" on the night in question.  West, 487 U.S. at 48.  The City's motion for summary judgment on the grounds that the Officers did not act "under color of state law" at the time of the alleged assault is therefore **DENIED**.

### C.  Conduct Pursuant to City Policy or Custom Under § 1983

The City also argues that it is entitled to summary judgment because Linthicum has not met her burden, under § 1983, of establishing a "causal link" between her alleged constitutional injury and a City policy or custom.  (Doc. #46 at 15-21; doc. #55 at 12-21.)  The City maintains that the only official policy at issue is its written disciplinary code and matrix ("disciplinary code")[60] for police officers, which both Officers have testified they did not understand to condone their sex with Linthicum and in any event disregarded on the night in question.  (See, e.g., doc. #46 at 16-17.)

---

[58] Linthicum's own testimony to the effect that she would not have gone home with two strangers and understood courtesy rides to be within the scope of the officers' duties or authority is entirely consistent with this view.  Again, while the City has cited portions of the Officers' testimony disputing Linthicum's motives in requesting or accepting the ride and the depth of her intoxication, this countervailing evidence does not eliminate a genuine dispute of material fact as to these critical issues.  The City's contention that "[t]here is no question that Kidd and Johnson would likely have been in the position to offer [Linthicum] a ride home, seeing that she was intoxicated and would have engaged in the sexual activity with her, regardless of their employment" (doc. #55 at 7), while potentially true, is not sufficiently supported by the record to overcome the City's burden of proof at summary judgment.

[59] See Part III.A, infra.

[60] Again, the Court uses the term "code," rather than "policy," to minimize any potential confusion with the more general requirement, under 42 U.S.C. § 1983, that a constitutional injury flow from some "policy" or custom.

The City reasons that to the extent Linthicum means to argue that the City failed to *enforce* a facially adequate disciplinary policy, thus manifesting a "deliberate indifference" to civil rights violations by officers that encouraged the Officers to engage in sex with Linthicum, her only proof of this failure is that two independent arbitrators reinstated the Officers after the City fired them pursuant to the disciplinary code.  (Id. at 17-21; doc. #55 at 12-14.)  The City further contends that the arbitrators clearly misinterpreted the code and that the City cannot be held accountable for this misinterpretation.  (Doc. #46 at 17-18; doc. #55 at 13-14.)

Linthicum responds that the City's disciplinary code is clearly unconstitutional, at least as applied to the Officers' cases through the police investigation, discipline and arbitration process.  (Doc. #50 at 14-16, 18.)  She further argues that the City has an unofficial policy or custom of inadequately training, investigating or disciplining police with respect to civil rights violations.  (Id. at 19-31.)  The City replies that Linthicum cannot establish the "pattern" of inadequate police discipline necessary to make an unofficial policy or custom actionable under § 1983 (see, e.g., doc. #55 at 15-20), and is specifically estopped from pleading any pattern of inadequate investigation or training because those issues were not properly pleaded in her Second Amended Complaint.  (Doc. #55 at 20-21.)

### 1.      Legal Framework

A plaintiff seeking to subject a city to § 1983 liability for the actions of its officers must "identify a municipal 'policy' or 'custom' that caused the plaintiff's injury."  Board of Cty. Commissioners of Bryan Cty. v. Brown, 520 U.S. 397, 403 (1997).  As this Court recognized in its prior Order on the City's motion to dismiss Linthicum's claims, Linthicum must at least show that some "supervisory official at least implicitly authorized, approved, or knowingly acquiesced" in the

55

Officers' allegedly unconstitutional conduct. (Doc. #40 at 7 (citing <u>Bellamy v. Bradley</u>, 729 F.2d 416, 421 (6th Cir. 1984).) Linthicum may satisfy this requirement in several ways. First, she may show that some official City policy, "made by its lawmakers or by those whose edicts may fairly be said to represent official policy," was a "moving force" behind Officers Kidd and Johnson's alleged violation of her constitutional rights. <u>Monell v. Dept. of Social Serv</u>., 436 U.S. 658, 695; <u>see also</u> <u>Brown</u>, 520 U.S. at 403-404. Alternatively, Linthicum may show that the Officers acted pursuant to some unofficial policy or custom that, while never "formally approved by an appropriate [City] decisionmaker," is nevertheless "so widespread as to have the force of law." <u>Brown</u>, 520 U.S. at 404; <u>see also</u> <u>Monell</u>, 436 U.S. at 690-691. Because these alternative theories of § 1983 liability are subject to different evidentiary standards, the Court separately analyzes the arguments and facts pertaining to each.[61]

### 2. Constitutional Violation Pursuant to Official Municipal Policy

Where a plaintiff seeks to establish that an *official* municipal policy is unconstitutional, even a "single incident of unconstitutional conduct by municipal employees" pursuant to that policy may give rise to a § 1983 claim. <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469, 478 n. 6 (1986). However, a single incident typically establishes § 1983 liability only where it flows from some unconstitutional decision by a "final municipal decisionmaker," such as a local legislative body or lead prosecutor. <u>See</u> <u>Brown</u>, 520 U.S. 406-407. In other words, a "single incident of unconstitutional activity is not sufficient to impose liability . . . unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." <u>Tuttle</u>, 471 U.S. at 823-24. Where the relevant policy is

---

[61] Unfortunately, the parties' summary judgment papers do not clearly or consistently distinguish between these alternative theories – complicating the Court's analysis.

"not *itself* unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality and the 'causal connection' between the 'policy' and the constitutional deprivation." Id. at 824.

Linthicum's second amended complaint alleges in part that the police "disciplinary policy and matrix of the City of Cincinnati results in no effective discipline for even outrageous and unconstitutional conduct by police officers, and in this instance, encouraged said conduct [and] condoned and ratified the constitutional deprivation" she suffered during her alleged assault. (Doc. #24 at 4-5 ¶ 19.) This portion of the complaint could be read to state a claim that her alleged assault was caused by an official police disciplinary policy. In its summary judgment papers, however, the City contends that Linthicum cannot support any such claim. It reasons that the disciplinary code could not have caused Linthicum's alleged assault in the first instance, because the Officers have testified that they disregarded it in deciding to have sex with Linthicum. (Doc. #46 at 16-17.) It further contends that its own intention "was clearly to dismiss the [O]fficers for their gross misconduct," that internal affairs "vigorously investigated [Linthicum's] claims," and that the City has investigated and ultimately terminated other officers for sexual misconduct in the past. (Id. at 20-21.) It reasons that even if the arbitrators failed to correctly interpret or apply the police disciplinary policies in reinstating the Officers, the City cannot be liable for that failure because the arbitrators are not City officers or officials. (Id. at 17-19.) In other words, the fact that the Officers' ultimate disciplinary penalties were "not as harsh as either the City or [Linthicum] would have preferred" does not establish either that the City's policies were facially unconstitutional or that they "encouraged unconstitutional acts." (Id. at 19.)

In response, Linthicum argues that the City's disciplinary code must be evaluated not in the

abstract, but rather as applied[62] in the Officers' arbitrations.  (See generally doc. #50 at 14-16.)  She reasons that as such, the City must be held accountable for the arbitrators' decisions to reinstate the Officers with (in Johnson's case) a non-disciplinary corrective action and (in Kidd's case) three days' unpaid leave.  (Id. at 16.)  She also suggests the City had – but failed to use – ultimate authority over whether to let the Officers return to work, because the City did not "exercise its right to appeal" the arbitrators' reinstatements.  (Id. at 18.)  Linthicum further alleges that the City's decision to charge the Officers only for their dishonesty during the early investigation of the alleged sexual assault – and not their actual conduct on the night of November 29th to 30th, 2001– constitutes a separate police "policy" to the effect that on-duty sex, even in the guise of sexual assault, is not an offense "worthy of termination."  (Id. at 16-17.)

As the City observes, Officers Kidd and Johnson's terminations and reinstatements necessarily followed, rather than preceded, their alleged assault of Linthicum.  Therefore, the assault could not have been "caused" by this single, *post-hoc* application of the City's official disciplinary code – even if, as a general proposition, a single application of an unconstitutional official policy may suffice to establish causation under § 1983.[63]  To the extent their allegedly inadequate discipline is relevant to the City's prospective liability for Linthicum's alleged assault, it must be because that discipline is *symptomatic* of a broader City pattern of failing to properly

_____

[62] Linthicum does not appear to contend that the City's official police disciplinary code is unconstitutional on its face.  While the portion of Linthicum's complaint referenced above could be construed to state such a facial claim, Linthicum's arguments in opposition to summary judgment appear to go only to the application of the disciplinary code.

[63] As noted above, the City has stressed the Officers' testimony that they disregarded the disciplinary code and associated penalties in deciding to engage in sex with Linthicum.  As Linthicum appears to concede by focusing her papers on the pattern-based "unofficial policy" or "deliberate indifference" theories discussed below, the testimony – if true – undercuts any theory that Linthicum's assault was prospectively *caused* by a single application of "official" policy.

discipline police officers for similar violations.  Linthicum suggests that this pattern led Kidd and

Johnson to expect that they would receive little or no discipline for engaging in sex with Linthicum

and thus – indirectly – fostered her alleged assault.  (See, e.g., doc. #50 at 14, 19, 23.)  However, as

a matter of both logic and law, such a pattern would have to be established through *multiple*

unconstitutional applications of the police disciplinary code in Linthicum's and other cases.  As

such, it is best analyzed under the alternative, "unofficial policy or custom" prong of § 1983

liability.  The Court now turns to that prong.

> **3.** **Constitutional Violation Pursuant to Unofficial Municipal Policy or Custom ("Deliberate Indifference")**[64]

As the Sixth Circuit has long recognized, "there need not be a formal policy for there to be

an unconstitutional custom that *amounts* to policy" for purposes of imposing liability under 42

U.S.C. § 1983.  Berry v. City of Detroit, 24 F.3d 1342, 1345 (6th Cir. 1994) (emphasis added).

Municipalities may be liable for "constitutional deprivations visited pursuant to governmental

'custom' even [where] such a custom has not received formal approval" from City decisionmakers.

Id. (citing Monell, 436 U.S. at 690-91.)  Even relatively passive customs that contribute to

constitutional violations – such as "inadequate training or supervision" of employees or "tolerance"

of or "acquiesence" in employees' unconstitutional conduct – may fall within the ambit of § 1983.

---

[64] Linthicum suggests in her papers that "unofficial policy or custom" and "deliberate indifference" constitute distinct theories or prongs of § 1983 liability.  (See doc. #50 at 12. (discussing "three methods for demonstrating § 1983 liability.")  However, the more recent case law suggests that – as a practical matter, and insofar as a plaintiff alleges that her constitutional violations stemmed from municipal *inaction* rather than action – these theories are effectively coterminous.  See, e.g., Thomas v. City of Chattanooga, 398 F.3d 426, 429 (6th Cir. 2004).  In any event, Linthicum's pleadings do not meaningfully distinguish between an "unofficial policy or custom" theory and a "deliberate indifference" theory, and present (in addition to the official policy theories discussed above) what is in substance a "deliberate indifference" argument.  (See, e.g., doc. #50 at 12-13, 19 (last paragraph).)

See Thomas v. City of Chattanooga, 398 F.3d 426, 429 (6th Cir. 2004).

A plaintiff seeking to establish liability under an "unofficial policy or custom" or "deliberate indifference" theory must typically show more than a single instance of unconstitutional conduct.  See, e.g., Tuttle, 471 U.S. at 824.  The Sixth Circuit has long emphasized that

> There is an analytical distinction between being deliberately indifferent as to one particular incident, and having a "policy" of always being deliberately indifferent to unconstitutional actions.  A municipality could be found to have a policy of failing to act in the face of repeated constitutional violations.  But it could also be found to have acted reasonably, or even negligently, in a particular case, thus precluding liability.

Doe, 103 F.3d at 508-509.

To sustain her § 1983 claim against the City of Cincinnati on a theory that the City has an unwritten but entrenched policy of tolerating or endorsing sexual assaults and other civil rights violations by its police force, Linthicum must show:

(1) The existence of a clear and persistent pattern of illegal activity;

(2) Notice or constructive notice on the part of the City;

(3) The City's tacit approval of the unconstitutional conduct, such that its deliberate indifference in their failure to act can be said to amount to an official policy of inaction; *and*

(4) That the City's custom was the "moving force" or direct causal link in the constitutional deprivation.

Thomas, 398 F.3d at 429 (citing Doe, 103 F.3d at 508.)

The Sixth Circuit has emphasized that "when we deal with sins of *omission*, as opposed to sins of commission, we should be certain that the causal linkage is present that makes the omission the proximate cause of the harm."  Berry, 25 F.3d at 1348 (emphasis added).  At the same time, however, the Circuit has emphasized that courts should not "disregard the gloss which life has

written upon" facially constitutional laws.  Id. at 1346.  Plaintiffs need not "produce evidence of

any deliberate or conscious choice" by municipal leaders "to adopt an unofficial policy or custom,"

so long as they can point to a "consistent and pervasive pattern" of police misconduct.  Id.

### a.    Scope of Linthicum's "Deliberate Indifference" Claims

In her present papers, Linthicum contends that there is an "an ongoing and widespread"

unofficial practice of inadequately disciplining, investigating, and training police in "deliberate

indifference" to citizens' rights.  (Doc. #50 at 1.)  As a threshold matter, the City argues that

Linthicum's complaint alleged at most[65] that the City has exhibited "deliberate indifference" in

*disciplining* police, and that Linthicum must therefore be estopped from arguing that the City has

also exhibited "deliberate indifference" in its *training* and *investigation* of police.  (Doc. #55 at 20.)

42 U.S.C. § 1983 claims are subject to the liberal notice pleading standards of Rule 8 of the

Federal Rules of Civil Procedure.  (See, e.g., doc. #40 at 7 (citing Leatherman v. Tarrant Cty.

Narcotics Intelligence and Coordination Unit, 507 U.S. 163, 168 (1993).)  Rule 8 requires only a

"short and plain statement of the claim" sufficient to "give the opposing party fair notice of the

nature and basis or grounds for a claim, and a general indication of the type of litigation involved."

Fed. R. Civ. P. 8(a)(2); Colonial Refrigerated Transp., Inc. v. Worsham, 704 F.2d 821, 825 (6th Cir.

1983) (internal citations omitted).  To satisfy Rule 8, a complaint must simply allege facts that

---

[65] The City also suggests that Linthicum's complaint challenged only the City's official
disciplinary code for police officers, and did not properly allege any unofficial policy or custom
of "deliberate indifference" as to even police *discipline*.  As the Court recognized in its July
2004 Order denying the City's motion to dismiss, and as noted at page 63, infra, Linthicum's
second amended complaint specifically alleges that "[i]n addition to the aforesaid disciplinary
policy and matrix, the city of Cincinnati over the course of several years has persistently failed to
discipline police officers who have violated the civil rights of citizens . . ."  (Order, doc. #40 at 8
(citing doc. #24 at 5).)  The cited allegation is sufficient, under Rule 8, to preserve Linthicum's
current claim that the City has exhibited "deliberate indifference" to police discipline.

would support a claim to relief under some applicable legal theory; a plaintiff need not detail the elements of any specific theory at the outset.  See, e.g., Worsham, 704 F.2d at 825; 5 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1219 at 281-84 (3d. ed. 2004).

Linthicum's complaint repeatedly references, and clearly focuses on, police disciplinary matters.  It mentions "investigation" in two predicate factual paragraphs describing Internal Affairs' investigation of Officers Kidd and Johnson and the Officers' contemporaneous calls and threats to Linthicum.  (See doc. #24 at 4 ¶¶ 14, 15.)  It does not mention, or allege any facts obviously relating to, the City's training of Kidd, Johnson, or other police officers.  The complaint does, however, include the following general allegation:

> In addition to the aforesaid disciplinary policy and disciplinary matrix, the city of Cincinnati over the course of several years has persistently failed to discipline police officers who have violated the civil rights of citizens and has engaged in a municipal policy of ratifying said unconstitutional conduct.

(Doc. #24 at 5 ¶ 21.)  Because this paragraph alleges *both* that the City has "persistently failed to discipline" police *and* that the City has "engaged in municipal policy of ratifying" civil rights violations by police, the latter phrase could plausibly be read to embrace matters of police policy other than police discipline.  In particular, the word "ratifying" could embrace other post-violation policies or customs – such as inadequate investigation – that appear to minimize the effect of past constitutional violations by individual police officers.  However, the word "ratifying" does not naturally encompass other policies or customs, such as inadequate training, that might be construed to encourage future constitutional violations.  Nor, as noted above, does the complaint contain any specific references to training.  Therefore, the Court will consider Linthicum's theories that the City has exhibited "deliberate indifference" in its discipline and/or investigation of police officers, but not her theory that the City has exhibited "deliberate indifference" in police training.

62

### b. "Deliberate Indifference" to Police Discipline

As discussed above, Linthicum's primary contention in opposing the City's motion for summary judgment is that the City has exhibited "deliberate indifference" in disciplining police officers for their violations of citizens' civil rights.  For support, Linthicum relies not only on Officers Kidd and Johnson's reinstatements after her alleged assault, but also on disciplinary incidents involving other Cincinnati police officers and on anecdotal evidence of a police culture in which sexual misconduct and civil rights violations are tolerated or condoned.

### i. Attribution of Arbitrators' Reinstatements of Officers Kidd and Johnson to the City

Because Linthicum's allegations that Kidd and Johnson were inadequately disciplined hinge largely on the Officers' reinstatements by arbitrators after their terminations, an important threshold issue is the extent to which the *City* may be held liable, under § 1983, for the arbitrators' applications of the police disciplinary code.[66]  Unfortunately, neither party offers any specific legal authority on this point.  The City reasons that it should not be bound by interpretations of the disciplinary code that are "poorly reasoned" and in conflict with the police department's own interpretations during the Officers' initial disciplinary proceedings.  (See, e.g., doc. #55 at 13-14.) Linthicum responds that the City must be held accountable for the arbitrators' applications of the code as a matter of contract law or general public policy, because the City should not able to shield itself from liability for police misconduct "simply by negotiating and delegating away its authority to terminate" police officers in a collective bargaining agreement.  (Doc. #50 at 18.)

While Linthicum's contractual privity theory has considerable logical appeal, the Supreme

---

[66] This question also bears on Linthicum's secondary allegation that the City has inadequately disciplined police officers other than Kidd and Johnson, to the extent those officers saw their initial disciplinary penalties reduced or eliminated by arbitrators.

Court has suggested that it applies in the § 1983 context only to the extent that a defendant

municipality has delegated its authority to *make* disciplinary policy *along* with its authority to

terminate individual employees *pursuant to* that policy.  As the Court explained in an illustrative

footnote to its decision in Pembaur v. City of Cincinnati:

> [A] County sheriff may have discretion to hire and fire employees without also being the
> county official responsible for establishing county employment policy.  If this were the case,
> the Sheriff's decisions respecting employment would not give rise to municipal liability,
> although similar decisions with respect to which the Sheriff is the official policy maker,
> would give rise to municipal liability.  Instead, if county employment policy was set by the
> Board of County Commissioners, only that body's decisions would provide a basis for
> county liability.  This would be true even if the Board left the Sheriff discretion to hire and
> fire employees and the Sheriff exercised that discretion in an unconstitutional manner; the
> decision to act unlawfully would not be a decision of the Board.  However, if the Board
> delegated its power to establish final employment policy to the Sheriff, the Sheriff's
> decisions would represent county policy and could give rise to municipal liability.

Pembaur, 475 U.S. at 482-83 n. 12.  Linthicum has not set forth any facts which suggest that the

independent arbitrators who reinstated Officers Kidd and Johnson under the City's official

disciplinary code were delegated responsibility for promulgating that code in the first instance.[67]

The Court is sympathetic to Linthicum's argument that constructions of § 1983 like the one cited

above may allow municipalities to limit their § 1983 liability for inadequate discipline by

contracting their enforcement authority, under facially constitutional policies, to independent

entities.  Nonetheless, on the facts of this case, the Court feels itself bound by the authority above.

The Court thus concludes that the City cannot be liable for the arbitrators' applications of the police

disciplinary code, because Linthicum has not established a genuine dispute of material fact as to

whether the arbitrators actually made or adopted that code – as opposed to simply applying it in

---

[67] As noted above, it appears that the current disciplinary code was adopted by the
Cincinnati Police Chief, possibly with input from the City Manager.  See supra note 28.  In any
event, there is no evidence that it was adopted by the arbitrators or an associated entity.

individual disciplinary appeals.

### ii. City's Failure to Appeal Arbitrators' Reinstatements of Officers Kidd and Johnson

While the City is not accountable under § 1983 for the arbitrators' direct applications of the disciplinary code to reinstate Officers Kidd and Johnson, it remains accountable for failing to exercise any discretion it retained to override or otherwise challenge those reinstatements. As Linthicum observes in her papers, it appears "the City did not even exercise its right to appeal" the arbitrators' decisions reinstating Kidd and Johnson. (Doc. #50 at 18; see also Streicher Dep. at 54-56 (describing prospect of appeals).) A reasonable jury could construe this apparent neglect of an opportunity to keep the Officers off the police force as evidence of the City's indifference to police discipline. However, because the failure to appeal concerns only Officers Kidd and Johnson, it is not independently sufficient to establish "deliberate indifference" under § 1983. See discussion supra at Parts III.C.2 and III.C.3 (introduction). Therefore, the Court must consider whether Linthicum has shown at least a genuine dispute of material fact as to whether the City has inadequately disciplined other officers.

### iii. "Deliberate Indifference" to Discipline of Other Officers

Linthicum alleges that Kidd and Johnson's experiences are symptomatic of a Cincinnati police disciplinary policy "so ineffective that officers don't even consider it before violating it." (Doc. #50 at 23.) She cites the reinstatements of Officers Underwood and Ewing as two other specific instances "where a [police officer] used his police power to get sex, and was not *ultimately* terminated" following arbitration. (See Doc. #50 at 20 (emphasis added) and Part I.A.6.a, supra.) Linthicum also contends that Underwood should have been specifically charged with sexual misconduct, but was not. (Id. at 20, 29.) Linthicum also alleges that the reinstatements of 19

terminated police officers between 1994 and 2004; the City's failure to appeal more than one of these reinstatements; and the subsequent misconduct by some reinstated officers indicate that the City has consistently failed to discipline officers.  (Doc. #50 at 21-22, 25 and Part I.A.6.a, supra.) She further alleges, by reference to Officer Kidd's testimony on other officers' use of the term "beat wife," that there is a "widespread" police practice of using "citizenry as sexual playthings."  (Id. at 20 and Part I.A.6.c, supra.)

The City responds that Linthicum's evidence falls far short of establishing a pattern of "deliberate indifference" to police discipline.  (See Doc. #44 at 15 and introduction to Part III.C.3, supra.)  With respect to the Underwood and Ewing cases, the City emphasizes that both officers *were* initially fired for misconduct and suggests that their reinstatements establish – at worst – a "collection of sloppy, or even reckless, oversights" by arbitrators that do not rise to the level of "obvious, deliberate indifference" to police sexual abuse.  (Doc. #44 at 17-19; Doe, 103 F.3d at 508.)  With respect to the nineteen total reinstatements of dismissed officers between 1994 and 2004 and the City's lone appeal of one of those reinstatements, the City argues that Linthicum's figures are presented in a "vacuum" and are therefore not meaningfully probative as to the existence of a pattern of inadequate discipline of Cincinnati police.  (Doc. #55 at 16.)

The City's contentions are well taken, but they are not sufficient to defeat Linthicum's claims at this stage of the proceeding.  While the City emphasizes that it initially terminated Underwood and Ewing for their misconduct, it also does not dispute Linthicum's assertion that it did not attempt to *preserve* those terminations by appealing Underwood and Ewing's reinstatements by arbitrators – or sixteen of the seventeen other reinstatements between 1994 and 2004 – to a court of law.  The Cincinnati Police Chief has testified that in his experience, "100 percent" of police

terminations are appealed to arbitration.  (See Part I.A.4, supra (citing Steicher Dep. at 56).)  The Chief has also testified that the City Manager and legal department decide – with input from the Chief – whether to appeal arbitrators' reinstatements of terminated officers like Kidd and Johnson. (See id. (citing Streicher Dep. at 54-55).)  These facts could reasonably be construed to suggest that the City has exhibited "deliberate indifference" to police discipline, either because it terminated officers with the expectation that they would be reinstated by arbitrators, or because it acquiesced in the arbitrators' reinstatements by failing to exercise its discretion to appeal to a court of law.

The Court is sympathetic to the City's observation that disciplinary statistics are most probative when presented alongside "comparative data" from "like-sized cities or like-sized police forces," rather than in isolation.  (Doc. #55 at 16 (citing in part Thomas, 398 F.3d at 430-31).) Indeed, there is presumably other data from *within* Cincinnati – such as the number of terminations (if any) that were *upheld* on appeal between 1994 and November 2001, or the total number of disciplinary cases and terminations during that period that stemmed from officers' unconstitutional and/or sexual mistreatment of civilians[68] – that would significantly aid a jury tasked with weighing the ultimate probity of Linthicum's cited figures.  This contextual material is not presently before the Court.  Nevertheless, it appears that a reasonable jury armed only with the present statistics and other cited evidence could, in reviewing the evidence in the light most favorable to Linthicum, conclude that the City has engaged in an unofficial custom or policy of "deliberate indifference" to

---

[68] While the present record is not entirely clear on this point, it appears that the majority of the nineteen terminations Linthicum cites did not involve sexual misconduct or other violations of individual citizens' rights, and that at least a few occurred *after* Linthicum's alleged November 2001 assault (and thus could not have directly contributed to it).  (See discussion and citations at Part I.A.6.a, supra.)

police discipline.  The City's claim for summary judgment as to this issue is therefore **DENIED**.[69]

        **c.**      **"Deliberate Indifference" to Investigation of Police Misconduct**

As discussed above, Linthicum has alleged that the City exhibits "deliberate indifference" to constitutional rights not only in *disciplining* police for proven misconduct, but also in *investigating* police for alleged misconduct.  (See Part III.C.3.a, supra.)  Again, to prevail on this theory under 42 U.S.C. § 1983, Linthicum must show a "pattern" of City misfeasance or nonfeasance that extends beyond the facts of her own case.  See introduction to Part III.C.3, supra.  For the reasons below, the Court concludes that Linthicum has not demonstrated a genuine dispute of material fact as to whether the City has exhibited "deliberate indifference" in investigating alleged police misconduct, and is therefore limited – for trial purposes – to her primary theory of inadequate police discipline.

        **i.**      **"Deliberate Indifference" to Investigation of Officers Kidd and Johnson**

In alleging "deliberate indifference" to police investigation, Linthicum again begins with the facts surrounding her own alleged assault by Officers Kidd and Johnson.  She contends that Internal Affairs' investigation marked the beginning of a "concerted effort . . . to downplay the seriousness of the [O]fficers' conduct."  (Doc. #50 at 25.)  More specifically, Linthicum complains that Internal Affairs set out to "sanitize" the November 29th to 30th incident by characterizing her sex with the

---

    [69] To reach this conclusion, the Court need not separately address Officer Kidd's testimony about "beat wives" and prevailing attitudes towards sexual misconduct.  This testimony appears to amount to little more than vague, unsubstantiated hearsay not subject to an exception.  In any event, both Kidd and Johnson have averred that they were not aware, before November 2001, of other officers' having engaged in sex on duty and escaping discipline – thereby undermining any potential casual link between this testimony and Linthicum's assault. (See Part I.A.6.c, supra.)  Linthicum suggests that the Officers' testimony on this point is not credible, but does not present any counter-evidence that calls it into dispute.

Officers as "consensual" despite extensive evidence that she was too intoxicated to consent and felt mentally coerced into sex. (Id. at 26-29; see also Parts I.A.1 and I.A.5.a, supra.) She reasons that an adequate investigation that acknowledged the Officers' "predatory" behavior should have resulted in a charge under rule 1.13 of the disciplinary code, which prohibits the solicitation of sexual favors. (Doc. #50 at 28; see also Part I.A.5.a, supra.)

The City does not specifically contest Linthicum's allegation that it exhibited "deliberate indifference" to investigation of her alleged assault, presumably because it takes the position on reply – since rejected by this Court – that allegations relating to police investigation fall outside the scope of Linthicum's complaint. (Doc. #55 at 20-22; see also Part III.C.3.a, supra.) The City maintains, however, that Internal Affairs "vigorously investigated" Linthicum's claims by "conducting interviews, taking [Linthicum] to the emergency room for testing and preventative medication and tapping her phone in order to catch Kidd and Johnson in any further contact with her." (Doc. #46 at 19.)

Again, the City's contentions are well taken. In addition to the facts cited by the City, the record reflects that Internal Affairs began investigating Linthicum's alleged assault immediately after she reported it and continued investigating it for approximately eight months despite Linthicum's own periodic efforts to end the investigation or her involvement with it. (See Parts I.A.3 and I.A.4, supra.) It also indicates that Internal Affairs referred Linthicum's case to the county prosecutor's office for investigation as a potential criminal sexual battery. (See Part I.A.5.a, supra.) Finally, it is undisputed that Internal Affairs' investigation resulted in the termination of both Officers. (See Parts I.A.5.a and I.A.5.b, supra.) While Linthicum would obviously have preferred for Internal Affairs' investigation to culminate with a finding that Officers Kidd and

69

Johnson *sexually assaulted* her, the record does not suggest that Internal Affairs deliberately

suppressed or ignored the facts supporting an assault finding.

Finally, even assuming *arguendo* that a reasonable jury found Internal Affairs' investigation

of Officers Kidd and Johnson to be inadequate, that finding alone would not be sufficient to make

the City liable for Linthicum's alleged assault under § 1983.  That is because, as discussed earlier,

Linthicum cannot rely solely on *post hoc* events surrounding her own alleged constitutional injury

to establish that the injury was caused by the City's "deliberate indifference" to unconstitutional

police conduct.  See Parts III.C.2 and III.C.3 (introduction), supra.  Again, the Court must evaluate

Linthicum's claim in the context of evidence implicating other incidents and police officers.

### ii.    "Deliberate Indifference" to Investigation of Other Officers

Unfortunately, Linthicum offers precious little evidence of a pattern of "deliberate

indifference" to investigation of police officers other than Kidd and Johnson.  Her primary

contention is that the City has repeatedly neglected to charge errant officers with sexual misconduct

or similarly "serious violations" of the police disciplinary code, even where the allegations against

them warrant such charges.  (Doc. #50 at 29.)  For support, she cites the cases of Officers Phillips,

Underwood and Grizzel.  (See id. at 29-30 and Part I.A.6.a and I.A.6.b, supra.)  It is undisputed,

however, that all three of these officers were fired for their misconduct and that Officer Grizzel was

never reinstated.  (See Parts I.A.6.a and I.A.6.b, supra.)  Moreover, it appears that two of the three –

Phillips and Grizzel – were not terminated until early 2003, *after* Officers Kidd and Johnson

allegedly assaulted Linthicum.  (See doc. #51 Ex. 10D and Harmon, 2005 WL 1106975 at *3.)

Finally, Linthicum has not set forth any specific facts regarding the City's actual *investigations* of

each officer's alleged misconduct, let alone sufficient facts to establish that those investigations

70

were inadequate.  Under the prevailing standards in this Circuit, no reasonable jury could conclude from these facts that the City exhibited a "deliberate indifference" to police investigation that contributed to Linthicum's assault.  The City's claim to summary judgment as to this sub-issue is therefore **GRANTED**, and Linthicum is barred from relying on an inadequate investigation theory to establish the City's liability at trial.

In sum, Linthicum has established a genuine dispute of material fact as to whether the City engaged in an unofficial policy or custom of inadequate police *discipline* that contributed to her alleged assault.  Because Linthicum has thereby stated all of the threshold elements of a claim to relief under 42 U.S.C. § 1983 for that subclaim, the City is not entitled to summary judgment and Linthicum's case may proceed.  However, because Linthicum has not preserved a genuine dispute of material fact as to whether the City has inadequately *investigated* police for constitutional violations and related misconduct, and her complaint did not adequately allege that the City has inadequately *trained* police to minimize such violations, she may not rely on these alternative theories to establish the City's liability at trial.

## IV.    CONCLUSION

For the reasons above, and pursuant to the Court's May 23rd, 2006 Order (doc. #58), Defendant City of Cincinnati's Motion for Summary Judgment (doc. #46) is **DENIED**, and Linthicum may proceed to trial on her theory that the City has an unofficial policy or custom of inadequately disciplining police officers that contributed to her alleged assault.

IT IS SO ORDERED.

 S/Susan J. Dlott
Susan J. Dlott
United States District Judge